540 F.Supp. 37 (1982)
Bob H. LEFTWICH, Plaintiff,
v.
HARRIS-STOWE STATE COLLEGE, BOARD OF REGENTS, Harris-Stowe State College, William G. Gillespie, James A. DeClue, Paul Brammeier, Velma Martin, Thomas F. Rafferty, and William Diehm, Defendants.
No. 81-118C(C).
United States District Court, E. D. Missouri, E. D.
May 5, 1982.
*38 Thomas A. Mickes, St. Louis, Mo., for plaintiff.
Charles R. Oldham, St. Louis, Mo., for defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
MEREDITH, District Judge.
This matter is before the Court for a judgment on the merits after trial to the Court. After consideration of the pleadings, testimony and exhibits introduced at trial, the parties' briefs and the applicable law, the Court makes the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff, Bob H. Leftwich, is a white male residing within the Eastern District of Missouri and was, at the time the subject matter of this complaint arose, forty-seven years of age.
2. Defendant Harris-Stowe State College is an institution of higher education located in St. Louis, Missouri, and is a member of The State College System of the State of Missouri. Defendant college is an employer in an industry affecting commerce and has employed fifteen or more employees for each working day in each of twenty or more calendar weeks at all times relevant hereto.
3. Defendant Board of Regents is the governing board of Harris-Stowe State College appointed by the Governor of the State of Missouri.
4. Defendants William G. Gillespie, James A. DeClue, Paul Brammeier, Velma Martin and Thomas F. Rafferty were members of the Harris-Stowe State College Board of Regents at all times relevant to this action. The above-named defendants are being sued in their individual capacities and as members of the Harris-Stowe State College Board of Regents. Defendant William Diehm presently serves on the defendant Board of Regents. Defendant Diehm is being sued solely in his present capacity as a member of the Harris-Stowe State College Board of Regents.
5. Prior to 1978, Harris-Stowe was under the control and management of the St. Louis Board of Education. The affairs of the college were governed by an Advisory Board and the college president.
6. Many of the Harris-Stowe faculty were employees of the St. Louis Public School system who were assigned to a faculty position at the college.
7. Faculty members who had obtained tenure while working with the St. Louis School system retained that tenure when assigned to Harris-Stowe.
8. Harris-Stowe adopted a policy of upgrading the faculty by requiring the faculty to achieve certain levels of performance. This performance usually consisted of a faculty member obtaining a doctorate degree.
9. Until this level of performance was achieved, a faculty member was required to sign a Statement of Understanding which read:
It is understood that this is not a permanent appointment. The tenure is with the school system and not with Harris Teacher's College. It is understood that reassignment to another position within the school system is possible. My appointment to Harris is contingent upon a level of performance which is perceived as one accepted by the College Administration.
10. Faculty members of Harris had to achieve this level of performance regardless of their tenure with the St. Louis School Board.
11. Faculty members who failed to attain this level of performance, i.e., a doctorate degree, were dismissed from the college *39 faculty regardless of their tenure with the St. Louis School system.
12. Many faculty members, including the plaintiff, followed a career path through a tenured position with the St. Louis Public Schools to a position in Harris-Stowe.
13. Plaintiff joined the St. Louis School system as a biology teacher at Southwest High School in 1957 and acquired tenure with St. Louis Public Schools in 1960.
14. Plaintiff was assigned to the Harris-Stowe faculty in 1968 as a lecturer.
15. Plaintiff, even though holding tenure status with the St. Louis School system, was required to sign the Statement of Understanding in 1969, 1971 and 1972.
16. After 1972, when plaintiff obtained his doctorate degree in biology, he was no longer required to sign the Statement of Understanding and was promoted from the rank of lecturer to the rank of assistant professor.
17. In 1975, plaintiff was promoted to the rank of associate professor, and in 1977, he was appointed chairman of the biology department.
18. The Harris Teacher's College Policy Manual provided that:
D. Each person, teaching at an elementary or secondary school in our school system, who is selected to teach at the College, is transferred with the understanding that he is on assignment at Harris on a year-to-year bases as a Lecturer until such time as the college administration recommends his appointment to college rank. The college administration will not, however, extend such year-to-year assignments indefinitely or unreasonably. (11/76).
No record exists of either approval or disapproval by the St. Louis School Board concerning this manual. However, many of the policies established therein were actually administered at the college.
19. Moreover, the Harris Faculty Handbook, prepared in 1974, provided for academic tenure after a probationary period not to exceed seven years after the appointment to the rank of a full-time instructor or a higher rank. While defendants deny that the Handbook was ever officially approved, the record is clear that they submitted the Handbook to the North Central Association of Colleges and Schools for accreditation purposes; it was circulated to some faculty members, including plaintiff; and it was placed in the college library.
20. In 1979, the control and management of Harris-Stowe was transferred from the St. Louis Board of Education to the State College system.
21. Under legislative authority, § 174.300 R.S.Mo.1978, a six member Board of Regents was appointed by the Governor of Missouri in 1978 to take over the management and control of Harris-Stowe.
22. The Board of Regents, pursuant to its statutory power to assume the general control and management of the college, made a determination to hire an entirely new faculty and staff.
23. To fill the new faculty positions with the State College system, the Board of Regents drew initial applicants from the pool of faculty members assigned to Harris-Stowe.
24. Faculty members were invited to submit applications for employment on the new staff. Approximately fifty-one full-time faculty members applied, including plaintiff.
25. Plaintiff applied for the same position he held under the St. Louis School system, a tenured position as an associate professor in the biology department.
26. To aid in their personnel decisions, the Board of Regents hired Dr. Warren Joseph of Educational Management Consultants who was to make recommendations to the Board of Regents concerning the personnel needs of the college.
27. Dr. Joseph decided to reserve a certain number of positions on the new staff for non-tenured faculty.
28. Dr. Joseph developed a program for the evaluation of the potential faculty and staff for the new positions with the State.
*40 29. The Board of Regents approved all aspects of Dr. Joseph's program.
30. As part of the evaluation process, each faculty applicant was required to interview with one of two teams of outside evaluators.
31. The two teams were given a packet by Dr. Joseph containing materials with which the applicants were to be evaluated. These materials provided for the ranking of applicants at four levels, level one being the best ranking. A list of criteria was also provided to evaluate the applicants. This list included such items as sex, race, and age.
32. Dr. Joseph combined the results and recommendations of the interviewers with a student evaluation, a self-assessment instrument, and a personal information instrument for each applicant.
33. This selection process was combined with other factors to formulate Dr. Joseph's employment recommendations to the Board of Regents. These additional factors were tenure status, anticipated student enrollment, the mission and needs of the college, the budget guidelines issued by the State, the student/faculty ratios, and the productivity rates of each applicant.
34. Dr. Joseph recommended that the biology department open only two full-time positions, one being tenured and one being non-tenured.
35. Dr. Joseph recommended that Mr. Watlington (black, age 62) be hired for the tenured position and that Dr. Terry Werner (white, age 30) be hired for the non-tenured position.
36. The Board of Regents accepted Dr. Joseph's employment recommendations.
37. Dr. Leftwich, the plaintiff, scored higher on all evaluations as well as in the interview than either Dr. Werner or Mr. Watlington, but was not offered employment.
38. At the time of the employment decision, no reason was given to the plaintiff as to why he was not hired except for the budgetary reason of "tenure density." Inadequate performance or credentials were not mentioned as factors in Dr. Joseph's and the Board's decision not to hire the plaintiff.
39. Plaintiff appealed the Board's decision, and in June, 1979, a hearing was held by the Board to consider plaintiff's appeal as well as other appeals.
40. At the hearing, Dr. Joseph testified as to his reasons for recommending plaintiff's non-employment. He stated that Watlington would be a better "role model" for students than Leftwich. Many people, including some members of the Board of Regents, took Joseph's words to mean that Watlington would make a better "role model" because he was black.
41. After the hearing, the Board of Regents did not hire the plaintiff, even though others were hired as a result of the hearings. The stated reason for the Board's decision was concern over the plaintiff's conduct at the hearing.
42. The outside interview team had made a notation on Watlington's evaluation sheet which read: "one of ten black males on faculty."
43. "Role model" was also written on other black applicants' forms. On the evaluation sheets used by the interview teams, the item "race" was circled on several black applicants' forms.
44. Based on Dr. Joseph's review of each college department, when the employment choice was between a black and a white, the black was hired. The only time a black was not employed occurred in situations where a black and a black applied and were considered for the same position.
45. The racial composition of the pool of applicants was approximately thirty whites and twenty-one blacks. The racial composition of the faculty hired by the Board of Regents was approximately nineteen blacks and sixteen whites. Approximately fourteen whites, as opposed to two blacks, were ultimately not employed.
46. Faculty members who had been members of the Harris-Stowe faculty prior to the change of control and who were *41 offered employment by the Board of Regents were granted the same academic rank and the same accumulated sick leave as they had with Harris-Stowe College.
47. Harris-Stowe faculty members who had tenure with the St. Louis Board of Education and who were employed by the Board of Regents were granted tenure by the Board.
48. In August of 1979, plaintiff filed charges of race and age discrimination with the Equal Employment Opportunity Office and a charge of race discrimination with the Missouri Commission on Human Rights.
49. Plaintiff complied with EEOC filing rules in a timely fashion. The EEOC investigated the charges, determined that discrimination existed, and attempted unsuccessfully to conciliate the matter.
50. On October 28, 1980, plaintiff requested a right-to-sue letter from the EEOC which was granted on January 17, 1981.
51. On February 2, 1981, plaintiff initiated the present action.
52. Plaintiff is, and since the beginning of the 1979-80 school year has been, employed as a high school teacher by the St. Louis Board of Education.

Conclusions of Law
1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343; 29 U.S.C. § 626; and 42 U.S.C. § 2000e-5. This is an action seeking relief under 29 U.S.C. § 621, et seq.; 42 U.S.C. § 2000e, et seq.; 42 U.S.C. § 1983; and the Fourteenth Amendment to the Constitution of the United States.

COUNT I
2. Count I of plaintiff's complaint is brought under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621, et seq. Plaintiff pleads a disparate treatment age discrimination violation. Plaintiff alleges that he belongs to a protected minority class (over 40), that he applied for a faculty position with Harris-Stowe State College and was qualified, that despite his qualifications he was not selected, and that Dr. Werner (under 40) was ultimately selected for that position. However, the position that the plaintiff originally sought and applied for was a tenured faculty position. The job that Dr. Werner was selected for was a non-tenured faculty position. Plaintiff and Dr. Werner were not in competition for the same position. Plaintiff has failed to prove that he applied for the same job for which a younger person was ultimately selected. The position for which plaintiff applied (tenured position) was filled by a person over 60 years of age. Thus, plaintiff has failed to establish a prima facie case of disparate treatment age discrimination under McDonnell Douglas v. Green, 411 U.S. 793, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Cova v. Coca-Cola Bottling Co., 574 F.2d 958 (8th Cir. 1978).
3. Plaintiff also contends that defendants' "tenure plan" (reserving some positions for non-tenured faculty) supports a claim of disparate impact discrimination. Through statistical data, plaintiff has adequately shown that the defendants' "tenure plan" has a discriminatory impact on older faculty members. By reserving non-tenured positions, the defendants adversely affect older teachers since a larger share of non-tenured teachers than tenured teachers are under forty years of age. If the Board of Regents had not reserved certain positions for non-tenured teachers, then the plaintiff could have been hired as a tenured faculty member. Thus, plaintiff has established a prima facie case of discriminatory impact. See Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 339, 97 S.Ct. 1843, 1854 n. 15, 1856, 52 L.Ed.2d 396 (1977).[1]
*42 4. Under Griggs, supra, the employer may defend its practice by a showing that the practice is justified by a business necessity and is related to the successful performance of the job for which the practice is used. Defendants claim that it is necessary to reserve certain positions for non-tenured teachers in order to cut expenses. The salary for a non-tenured professor is much less than that for a tenured professor.
5. Economic savings is not a valid business excuse to defend a prima facie case of disparate impact. See Geller v. Markham, 635 F.2d 1027, 1034 (2d Cir. 1980) cert. denied 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981) (Rehnquist, J., dissenting); Marshall v. Arlene Knitwear, Inc., 454 F.Supp. 715, 728 (E.D.N.Y.1978); Laugeson v. Anaconda Co., 510 F.2d 307, 316 (6th Cir. 1975). Consequently, plaintiff has established a disparate impact case of age discrimination.

COUNT II
6. Count II of plaintiff's complaint is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.[2] Plaintiff alleges that he was denied employment with Harris-Stowe State College due to his race (white). He establishes a prima facie disparate treatment case under McDonnell Douglas v. Green, supra, in that he is of a certain race (white)[3], he applied for tenured faculty position in the biology department of Harris-Stowe and was qualified for such a position, despite his qualifications, he was not selected, and a person of a different race (black) was ultimately selected for the position.
7. The defendant must now meet the burden of articulating a genuine issue of fact or reason other than discrimination on the basis of race for the plaintiff's non-employment. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The defendants need only to show that the decision was based on a legitimate concern. Id. In this case, the defendants offer reasons of "tenure density" and displeasure with plaintiff's conduct at the June, 1979, rehiring hearing. Under Burdine, the defendants have met their burden of articulating a non-discriminating reason for plaintiff's non-employment.
8. Plaintiff carries the ultimate burden of proving that the defendants' reasons were not the true reasons for its employment decision. Plaintiff must persuade the Court that he was a victim of intentional discrimination by defendants. See Burdine, supra at 256, 101 S.Ct. at 1095.
9. Dr. Joseph's employment recommendations were based upon the use of various devices. One such device was an evaluation list for each interviewing team to evaluate each applicant. Race was a factor printed on this list. The interviewers circled race or wrote comments concerning race as a qualifying factor on several applications. All of the applicants who had race circled or written on their evaluation sheets were black. All of the applicants who had race circled or written on their evaluation sheets were hired except one.
10. Each time a black and a white competed for the same position or positions *43 with Harris-Stowe State College, a black was hired. The only time a black applied for a position and was not hired occurred when a black competed against another black for the same position. Approximately twenty-one blacks and thirty whites who were on the faculty of Harris-Stowe under the St. Louis Board of Education applied for positions with the new college. After the college was transferred to the Board of Regents' control, the faculty was comprised of approximately nineteen blacks and sixteen whites. After the Board of Regents' employment decisions, only two blacks were ultimately not rehired, as compared to fourteen whites who were not rehired. Of the fourteen whites not rehired, many scored higher on Dr. Joseph's employment tests than the blacks who were employed.
11. Race was specifically mentioned on Mr. Watlington's form as a factor in employment. Mr. Watlington's evaluation form noted that he was one of ten black males on the faculty staff and he would make a good "role model." The plaintiff, Dr. Leftwich, scored higher on all of Dr. Joseph's employment tests than Mr. Watlington, yet Watlington was recommended by Dr. Joseph for the biology staff position over Dr. Leftwich.
12. The Board of Regents accepted all of Dr. Joseph's employment decisions except one. The Board approved of Dr. Joseph's employment process including the interview packet containing race as an employment factor. The Board never saw a completed evaluation form although they saw and approved a blank form. Even though the Board never saw any completed employment evaluation forms or tests, they nevertheless approved Dr. Joseph's recommendations based upon these forms and tests. The Board, thus, was responsible for using race as a factor on employment decisions. This total disregard for the use of an unacceptable factor in an employment decision by blindly accepting Dr. Joseph's recommendations indicates intentional discrimination based on race in employment decisions.
13. The facts above indicate that race was a factor upon which faculty employment decisions were based. Thus, plaintiff has fulfilled his burden of proving that race discrimination did exist even in the face of defendants' non-discriminatory employment selection reasons.

COUNTS III, IV, AND VI[4]
14. Plaintiff claims the Board of Regents violated his Fourteenth Amendment due process rights by not giving him a hearing before terminating his employment; by depriving him of his property interest in continued employment based on arbitrary, capricious, and discriminatory factors; and by depriving him of his property interest in continued employment due to plaintiff's demeanor at the June, 1979, Board hearings.[5]
15. To determine if plaintiff's due process rights have been violated, it must be ascertained if plaintiff had a property interest in continued employment with the college and if this property interest transferred with the rest of the college to the Board of Regents' control.
16. Plaintiff did not have de jure tenure with Harris-Stowe when it was administered by the Board of Education. Nothing in plaintiff's contract with the Board, or the Board's own rules, or the Missouri statutes *44 expressly conferred tenure rights on plaintiff with respect to his position at the college. Plaintiff had de jure tenure only with the Board of Education.
17. Under Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) and Perry v. Sinderman, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), however, a college professor does not need tenure or a formal contract to possess a protected property interest in continued employment. A clear implied promise of continued employment based on the employer's words and conduct in light of the surrounding circumstances is enough to insure possession of a property interest. In the case at hand, Dr. Leftwich had tenure with the St. Louis Board of Education. He also was required to sign a Statement of Understanding by Harris-Stowe College. This Statement stated that although plaintiff had tenure with the St. Louis School Board, he did not have tenure with the college until he met a certain level of achievement. After plaintiff had obtained his doctorate degree in biology, he was no longer required to sign these Statements. In addition, a policy manual and a faculty handbook each described requirements for tenure with Harris-Stowe College. Through these words and actions of Harris-Stowe, plaintiff appears to have had an implied promise of continued employment at the college, i.e., de facto tenure.
18. Assuming, arguendo, that plaintiff did have de facto tenure at Harris-Stowe, that tenure nevertheless did not transfer to the new college. Any property right in continued employment which plaintiff may have had was associated with his original employer. Lacking an agreement to the contrary, a new employer is not bound to accept the employees of the old. See NLRB v. Burns, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) (new employer was not required to accept a collective bargaining agreement, which affected employment, of the old employer). In this situation, the Board of Regents is not the employer under which the plaintiff acquired this property right in continued employment. The St. Louis School Board under which the plaintiff had a property interest, transferred all control over Harris-Stowe College to the control of the Board of Regents. Even though the State of Missouri ultimately governs both of these Boards, each is a separate operating entity, empowered by the State to govern and control itself, see §§ 162.571 R.S.Mo.1978, including employing staff for schools under their government and control. Even though little change may have occurred as a result of the transfer of control between the St. Louis Board and the Board of Regents, the fact remains that the control and government did change. The Board of Regents is not the same employer as the St. Louis Board of Education. Therefore, the property interest in continued employment does not transfer to the new state college. Plaintiff did not have a right to expect continued employment under the Board of Regents. Thus, plaintiff's Counts II, IV and VI must fail.

AFFIRMATIVE DEFENSES
19. Exhaustion of Remedies. Defendants claim that the plaintiff did not exhaust his judicial and administrative remedies under Counts I and II. 29 U.S.C. § 633 and 42 U.S.C. § 2000e-5 only require that notice be given to the State of the charges; that the EEOC conduct an investigation finding discrimination; and that a conciliatory attempt be made with the State before federal action may be taken. The plaintiff filed charges with the EEOC and the State Commission on Human Rights. The EEOC investigated the charges and determined that discrimination existed. The EEOC also attempted and failed to conciliate the matter.
That plaintiff may have plead discrimination based on an employment dismissal decision and not discrimination based on an employment hiring decision in the EEOC proceedings is of no consequence. The substance of the allegations of discrimination raised by plaintiff in this action are like and related to plaintiff's EEOC charges. The allegations in plaintiff's complaint are, therefore, properly before this *45 Court on the basis of plaintiff's EEOC charges. Satz v. I.T.T. Financial Corp., 619 F.2d 738, 742 (8th Cir. 1980).
20. Res Judicata and Collateral Estoppel. Defendants claim that this action is barred by res judicata and collateral estoppel by the Board of Regents' decision not to employ the plaintiff. Once a claim or an issue has been litigated in a valid judgment, final on the merits between two parties, the same issue or claim cannot be raised in a subsequent judicial proceeding. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). In this case, the Board of Regents did not make a final determination on the issue of race discrimination. All the hearing determined was whether the plaintiff should be granted employment. A final decision can only be entered after the parties have been given an opportunity to litigate the claim before a court of competent jurisdiction. See International Harvester Co. v. Occupational Safety and Health Review Commission, 628 F.2d 982 (7th Cir. 1980) and Kaspar Wire Works Inc. v. Leco Engineering and Machine Inc., 575 F.2d 530 (5th Cir. 1978). The Board is not a court of competent jurisdiction. It does not have the power to make final adjudicatory decisions binding on other bodies of law nor does it have the power of personal jurisdiction so as to be able to use the power of subpoena. Even though attorneys were present at the hearing, the parties did not have an opportunity to litigate according to evidentiary rules. Plaintiff's claim and issues of race and age discrimination are not barred by res judicata or collateral estoppel.

REMEDIES
21. Plaintiff is entitled to relief under Counts I and II. Both 29 U.S.C. § 626(b) and 42 U.S.C. 2000e-5(g) allow reinstatement or hiring of aggrieved employees with back pay. Plaintiff requests that he be hired by Harris-Stowe State College with the rank of full professor. When plaintiff left the old college he was an associate professor. At the old college promotions to the rank of full professor were apparently granted only rarely and were a sign of distinct achievement. Plaintiff has not satisfied this Court that he would have received such a promotion under this standard, nor has he offered evidence that promotions at the new college are granted according to a more lenient standard. Indeed, on the basis of the record now before the Court, it seems likely that promotions at the new college may be even more difficult to obtain. For this reason, the Court is unable to conclude that "but for" defendants' discriminatory practices, plaintiff would now hold the rank of full professor. Accordingly, the Court will order only that plaintiff be hired by Harris-Stowe at his prior rank of associate professor in the biology department.
Plaintiff shall be hired with the same tenure as he held with the St. Louis Board of Education. Plaintiff is entitled to this tenure because it was granted by the Board of Regents to all other faculty members who left their employment with the Board of Education to assume positions at the new college. For the same reason, the Board of Regents shall recognize any sick leave which plaintiff has accumulated with the Board of Education. Defendants shall not be required, however, to appoint plaintiff as chairman of the Harris-Stowe biology department.
Plaintiff must notify the Board of Regents within thirty (30) days as to whether he intends to accept the position with them on their terms.
22. Plaintiff is not entitled to an award of back pay for lost salary. When Harris-Stowe was reorganized and placed under state control, plaintiff continued to work for the Board of Education in St. Louis. His salary for the 1979-1980 school year was $21,500, for 1980-1981 it was $23,500, and for 1981-1982 it was $25,500. Had plaintiff been hired by the new college he would have been paid a salary of $22,309.50 for 1979-1980. This is based on his 1978-1979 salary of $20,850 from the Board of Education plus a 7% wage increase granted by Harris-Stowe to all faculty members. Harris-Stowe granted an additional 8% *46 wage increase to its faculty in 1980-1981, which would have raised plaintiff's salary to approximately $24,094.26. No additional increases were granted in 1981-1982, so plaintiff's salary for that year would also have been approximately $24,094.26. When one composes these figures it appears that plaintiff's base salary from the Board of Education for 1979-1982 was actually slightly higher (by approximately $1.98) than it would have been at Harris-Stowe.
23. Plaintiff shall be awarded amounts lost as the result of his inability to teach summer school. Plaintiff established that while he was on the faculty of the old college, he taught summer school regularly. He averaged two courses per summer at $800.00 per course. When he was not hired by the new college, he could not continue to teach these courses. The policy of the Board of Education precluded it. Plaintiff has, thus, lost $1,600 per summer for each of the two summers since the decision was made not to hire him at the new college, for a total of $3,200. Defendants Harris-Stowe State College; its Board of Regents; and William G. Gillespie, James A. DeClue; Paul Brammeier, Velma Martin, Thomas Rafferty, and William Diehm, in their official capacities as members of the Board of Regents, shall be jointly and severally liable to plaintiff for this amount.
24. Plaintiff has failed to adequately show that he is entitled to recover for any other lost income. The record does not support an award of liquidated damages under Count I. Plaintiff is not entitled to recover punitive damages or damages for pain and suffering.
25. Plaintiff shall be awarded his attorney's fees and costs. 42 U.S.C. § 2000e-5(k); 29 U.S.C. § 626(b); Fed.R.Civ.P. 54(d).
NOTES
[1] Principles of Title VII also govern age discrimination cases. See Cova v. Coca-Cola Bottling Co., 574 F.2d 958 (8th Cir. 1978); Geller v. Markham, 635 F.2d 1027, 1032 (2d Cir. 1980), cert. denied, 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981) (Rehnquist, J., dissenting).
[2] Plaintiff apparently also seeks relief on this Count under 42 U.S.C. § 1983. A party may ordinarily bring an action under both Title VII and § 1983. Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 459, 95 S.Ct. 1716, 1719, 44 L.Ed.2d 295 (1975). However, the law in this circuit is clear that a public university and its corporate board of regents, as political subdivisions of the state, may not be sued under § 1983 because they are not "persons" within the meaning of the statute. Prostrollo v. U. of South Dakota, 507 F.2d 775, 777 n. 1 (8th Cir. 1974), cert. denied, 421 U.S. 952, 95 S.Ct. 1687, 44 L.Ed.2d 106 (1975); Regents of U. of Minn. v. NCAA, 560 F.2d 352, 362 (8th Cir.), cert. dismissed, 434 U.S. 978, 98 S.Ct. 600, 54 L.Ed.2d 472 (1977). Accordingly, plaintiff has no § 1983 cause of action against either Harris-Stowe or its Board of Regents. It may proceed under § 1983 only against the individual members of the Board of Regents. For the reasons discussed in connection with Counts III, IV and VI, however, these § 1983 claims must fail as well.
[3] Title 42 U.S.C. § 2000e-2 states that employment personnel decisions cannot be based on race. This includes any race, black or white.
[4] Count V, alleging First Amendment violations, was dismissed with prejudice on December 3, 1981.
[5] Plaintiff's claims under these counts apparently seek relief directly under the Fourteenth Amendment, jurisdiction being premised on 28 U.S.C. § 1331. As suggested in footnote 3, plaintiff is precluded from seeking redress under these counts under 42 U.S.C. § 1983 against the college or its corporate board of regents. Given that § 1983 does not allow for actions against these entities, the question arises as to whether a private right of action against them should be implied directly under the Constitution. This issue was raised, but not resolved, by the Supreme Court in Mt. Healthy Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) and by the Eighth Circuit in Regents of U. of Minn. v. NCAA, supra. This Court need not attempt to resolve the issue now, however, in light of its determination that plaintiff was not deprived of a constitutionally protected property right by the Board of Regents.