Joseph GARDINER, et al.

v.

James D. TSCHECHTELIN, et al.

Civ. No. HM–90–3218.

United States District Court,
D. Maryland.

June 11, 1991.

Joel A. Smith, Lutherville, Md., for plaintiffs.

Ralph S. Tyler, Baltimore, Md., Robert A. Zarnoch, Annapolis, Md., J. Joseph Curran, Jr., Carmen M. Shepard, Baltimore, Md., for defendants.

## MEMORANDUM

HERBERT F. MURRAY, Senior District Judge.

Plaintiffs, a class comprised of faculty members who enjoyed tenure at the Community College of Baltimore ("CCB"), have brought this action under 42 U.S.C. § 1983 challenging the abrogation of tenure which

occurred after the State of Maryland took over the college, now called the New Community College of Baltimore ("NCCB"). Plaintiffs contend that defendants[1] have violated the Contracts Clause and Due Process Clause of the United States Constitution.

The parties have filed cross-motions for summary judgment. A hearing on the motions was held on Friday, May 17, 1991. The Court has considered the written memoranda and exhibits submitted by counsel and the arguments made at the hearing, and is now prepared to rule. This case was put on an expedited schedule to ensure that a ruling could be made prior to the close of the school year, June 30, 1991. The parties and the Court agree that the issues presented are questions of law that can be properly resolved on summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1947, the City of Baltimore under its Charter Powers established Baltimore Junior College, later to become the Community College of Baltimore. The College was organized as a division of the City's Department of Education and governed by the Board of School Commissioners. In 1961, the Maryland General Assembly authorized the creation of a system of community colleges throughout the State. 1961 Md. Laws Ch. 31. On June 22, 1961, the Baltimore City Board of School Commissioners met as the Board of Trustees for Baltimore Junior College and established the "Baltimore Community College" under Md.Ann. Code art. 77, § 300 (1959). The College adopted its own By-laws in 1962, providing that the President could elect a teacher to tenure following five years of probationary service. Through 1968, the Board of School Commissioners and the Board of Trustees for Baltimore Junior College were one and the same. In 1971, the College's Board of Trustees amended its By-laws,

setting forth the manner in which faculty would be elected to "permanent tenure" and explaining the disciplinary procedures that would apply to tenured faculty.

Until June 30, 1990, the Community College of Baltimore was a Baltimore City institution overseen by the State Board of Community Colleges and the Maryland Higher Education Commission and receiving substantial State funding. However, unlike most of the other community colleges in Maryland, for which the board members were appointed by the Governor, the members of the Board of Trustees for the Community College of Baltimore were appointed by the Mayor and City Council of Baltimore. Md.Educ.Code Ann. § 16–502 (1985) (repealed Jan. 1, 1991). During the past decade, CCB faced a drastic decline in enrollment and significant increase in tuition fees. Floor Report, Economic & Environmental Affairs Committee on House Bill 381 (Defendants' Ex. 3). Baltimore City residents were much more likely to register at a community college other than CCB. *Id.* It was felt that the College curriculum was not adequately meeting the needs of the students in Baltimore City, who face the highest unemployment rate in the State. *Id.* Moreover, Baltimore City did not have the funds to run the College so as to meet the needs of the community. *Id.* Mayor Kurt L. Schmoke of Baltimore City proposed to Governor William D. Schaefer that the State of Maryland assume financial responsibility for the College. On January 22, 1990, the Board of Trustees of CCB voted to endorse a proposal for the State to take over the College.

In 1990, the Maryland General Assembly passed Senate Bill 381 and House Bill 381, codified at Md.Educ.Code Ann. § 16–601–610 (Supp.1989), which decreed that the Community College of Baltimore was now a State institution called the New Community College of Baltimore. The statute authorizes the College to continue

---

1. The defendants are: James D. Tschechtelin, individually and in his capacity as President of the New Community College of Baltimore; Ron D. Wright, individually and in his capacity as Vice President for Academic Affairs of the New Community College of Baltimore; Marion Pines, individually and in her capacity as President, Board of Trustees of the New Community College of Baltimore; and Barbara Hopkins, individually and in her capacity as Chairperson, Faculty Appeals Board of the New Community College of Baltimore.

for a trial period of only three years, and new legislation must be enacted to continue the College past June 30, 1993. Under the statute, a new Board of Trustees was established, with members appointed by the Governor with the advice and consent of the Senate. *Id.* at § 16–604(b). The statute provides that neither the State, the New Community College nor its Board of Trustees would be responsible for any liability or contract of the Community College of Baltimore, unless expressly assumed by the new Board of Trustees. *Id.* at § 16–610. A sub-section entitled "Previous employee; temporary employment" requires that the NCCB's Board of Trustees "offer employment from July 1, 1990 through December 31, 1990" to any faculty member or other employee of the Community College of Baltimore. *Id.* at § 16–609(a). The terms and conditions of employment for any officer or faculty member would be set by the new Board of Trustees. *Id.* at § 16–609(f).

On May 1, 1990, Dr. Joseph Durham, then president of CCB, sent letters to all CCB employees, giving them notice of termination effective June 30, 1990. On May 21, 1990, James D. Tschechtelin, formerly executive director of the State Board for Community Colleges, was appointed "Director of Transition" by the Board of CCB and put on the City payroll.[2] On July 1, 1990, Mr. Tschechtelin became "Interim President" of the New Community College of Baltimore. After June 30, 1990, the New Community College of Baltimore continued to operate as before, offering the same courses and degrees, employing the same faculty, and enrolling the same student body. NCCB continued to employ all faculty members who did not resign. Of the approximately 110 faculty members at CCB, 96 remained and were employed by NCCB after July 1, 1990. The faculty continued with the same teaching assignments and salaries as they enjoyed previously at CCB. In addition, approximately 12 new faculty members were hired.

On September 20, 1990, the NCCB adopted a four tier rating system for faculty members carried over from CCB. The Vice President of the College would arrive at a recommended rating for each faculty member, based on evaluations by the faculty member's assistant dean, other faculty members, and students. Faculty members rated "poor" would be discharged at the end of the school year, June 30, 1990. Those rated "fair" would continue through the end of the year with another evaluation in the second semester. Faculty rated "good" were promised two years of employment. Faculty rated "excellent" would continue to be employed for three years. Only those faculty rated "poor" would be entitled to any type of hearing. All faculty members received their evaluations and ratings on December 7, 1990, and were informed about their rights to appeal.[3] Appeals were to have been filed by December 11, 1990. The panels to hear the appeals were to be selected at 2:00 pm on December 11, 1990. Panel hearings were scheduled for December 13, 14, and 15, 1990, at which time the faculty members would have their only opportunity to present witnesses and new documentary materials. The panels were to issue their decisions on December 17, 1990 at 9:00 a.m. If a faculty member wanted to further appeal the decision to the President, the appeal was to be filed within two hours, at 11:00 a.m. on December 17, 1990. The President would decide the appeal at 1:00 p.m. on the same day, and this decision would be final.

On December 12, 1990, four faculty members of the College filed a complaint[4]

---

**2.** Mr. Otis Warren, Chairman of the CCB Board of Trustees, states that the Board of Trustees for the New Community College of Baltimore confirmed Mr. Tschechtelin as Director of Transition on May 21, 1990, at the new Board's first meeting. (Declaration of Otis Warren, Defendants' Ex. 5). However, the minutes of the meetings indicate that the May 21, 1990 meeting was of the old CCB Board and the first meeting

of the new Board occurred on June 20, 1990. (Defendants' Ex. 5).

**3.** Of the 96 faculty who were evaluated, 26 were rated as "excellent", 44 "good", 19 "fair" and 7 "poor." Six of the seven rated "poor" were tenured faculty at CCB.

**4.** The Court was advised that plaintiffs would be filing a motion for class certification.

and a motion for a temporary restraining order to prevent the College from continuing with the appeals procedure. Plaintiffs contended that the hearing process did not comport with due process because sufficient preparation time was not given, the rating system was not adequately explained, and the hearing would not address the rating itself but merely the fairness of the rating process. This Court granted plaintiffs a Temporary Restraining Order on December 14, 1990 after reviewing the parties' written submissions and considering the parties' oral arguments made at a hearing on December 13, 1990. The Order prohibited defendants from continuing the evaluation or appeals process and from terminating the employment of any faculty member who was tenured by the Community College of Baltimore.

Subsequent to this Court's issuance of the Temporary Restraining Order, the defendants made adjustments to the original evaluation and appeals process. On December 19, 1990 the Board of Trustees of NCCB authorized President James D. Tschechtelin to ensure that all faculty would have continued employment through June 15, 1991 and to ensure that a new appeal process would be commenced that would address the plaintiffs' requests and provide them with more time. On the same day, the Board approved the President's recommended new appeals procedure. Under this procedure, on or about but not before January 7, 1991, all faculty would be notified anew of their respective evaluations. Faculty rated "excellent" would be offered new two year contracts for the academic years 1991–1992 and 1992–1993. Those faculty evaluated as "good" would be offered new one year contracts for 1991–1992. Faculty rated "fair" would be reevaluated in the Spring with the opportunity to then obtain a further contract. Faculty evaluated as "poor" would not be offered contracts beyond this academic year. The faculty members with "poor" ratings would have the opportunity to challenge the evaluations if, within ten days of receipt of the evaluation, they made a request for a hearing. A hearing would be held no sooner than fifteen days after it was requested. The Appeals Board would be comprised of five persons who had not participated in the appealing faculty member's evaluation. The panel would consist of a chair, two administrators, and two faculty members. The Appeals Board would give a written decision including a statement of reasons for its decision. The faculty member could further appeal the evaluation to the President by request for review within seven days of the Board's decision. The President would review the record and make a recommendation to the Board of Trustees. The Board of Trustees would then consider the recommendations of the President at a public meeting and "any affected faculty member" would be entitled to appear. (Defendants' Ex. 15). The Board of Trustees would then decide whether to adopt or reject the President's recommendation.

At a hearing held on December 21, 1990, plaintiffs argued that despite the changes in the appeals process, a preliminary injunction was needed. This Court decided that an injunction was no longer needed, since the College had made good faith efforts to give the faculty more time for appeal and had agreed to not terminate any faculty until June 30, 1991. The Court has been notified that the appeals process has now been completed. At least one faculty member's rating of "poor" has been sustained by the Board of Trustees and a notification of termination has been received.

On April 2, 1991, after a hearing, this Court certified a class action under Fed.R. Civ.P. 23(b)(2), describing the plaintiff class as:

> [A]ll tenured faculty of the Community College of Baltimore who were carried on payroll as faculty of the New Community College of Baltimore at anytime between July 1, 1990 and December 31, 1990.

Paper No. 28.

## II. LEGAL ANALYSIS

Summary judgment is appropriate when the supporting material shows that "there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Because the parties and the Court agree that there is no dispute as to material fact, the Court will directly address the legal issues presented.

### A. Is There a Substantial Federal Question?

In their motion for summary judgment, defendants argue that this case should be dismissed because no substantial federal question is presented. Defendant argues that the complaint does not raise a substantial federal question under *Goldsmith v. Mayor of Baltimore,* 837 F.2d 158 (4th Cir.1988). In *Goldsmith,* plaintiff claimed that due process was violated by the Baltimore City Council's elimination of her position as Director of the Office of Financial Responsibility. In 1983, the City Council, through legislation, created the City Council Office of Financial Review, the Director of which would be subject to removal only for inefficiency, neglect of duty or misconduct. In 1985, the City Council enacted legislation abolishing the position of Director of the Office of Financial Responsibility, creating instead the Office of Councilmanic Services. The Fourth Circuit ruled that the district court lacked subject matter jurisdiction over the claim. The court reasoned:

> Approached from any angle, this case merely presents a conflict between a public officer and the city council which created her position. The Supreme Court has ruled time and time again that, under the federal constitution, a legislative body, including municipal councils, has the unfettered authority to create, alter and abolish such positions.

*Id.* at 161–162. The court relied on *Higginbotham v. Baton Rouge,* 306 U.S. 535, 59 S.Ct. 705, 83 L.Ed. 968 (1939), a Contracts Clause challenge to the City of Baton Rouge's legislation abolishing the office of Commissioner of Public Parks and Streets. The Supreme Court rejected Higgenbotham's challenge because "a municipal council may remove at any time any official appointed or elected by the Council, or anyone employed by the Council to per-

form governmental functions." *Id.* at 538, 59 S.Ct. at 706. The Fourth Circuit in *Goldsmith* also referred to 63A Am.Jur.2d *Public Officers and Employees* § 31, which provides in part:

> The power to create an office generally includes the power to modify or abolish it. Where the office is of legislative creation, the legislature may, unless prohibited by the Constitution, control, modify, or abolish it whenever such course may seem necessary, expedient or conducive to the public good.

*Goldsmith, supra,* at 161, n. 2. Contrary to defendants' assertions, the instant case does not present "parallel" facts to *Goldsmith* or *Higginbotham.* Both Goldsmith and Higginbotham were public officials performing governmental functions. Plaintiffs in the instant case are teachers at a public community college but perform no governmental functions. As such, they cannot be considered public officials. For example, the Maryland Court of Appeals has held that public school teachers are not public officials:

> [I]t seems clear that a public school teacher would not qualify as a public official. A teacher is not required to take an official oath; he receives no commission; gives no bond; is not commonly thought of as an officer or occupant of an office; does not exercise sovereign powers of government in his own right although a teacher is given tenure through Art. 77 § 115 of the Ann.Code of Md. (1969 Repl.Vol.).

*Duncan v. Koustenis,* 260 Md. 98, 105, 271 A.2d 547 (1970).

Moreover, the plaintiffs' positions themselves have not been eliminated. Rather, tenure has been abrogated, and certain individual faculty members will be terminated based on their respective evaluations. Furthermore, unlike *Goldsmith* and *Higginbotham,* the faculty's positions were not directly created by legislation; nor were the faculty members elected officials. As discussed below, the plaintiffs had a contractual right to tenure. This Court believes that the claim in the instant case is

distinguishable from *Goldsmith* and raises a substantial federal question.

### B. *Contracts Clause*

■ The plaintiffs argue that the State's legislation and/or the New Community College of Baltimore's actions under that legislation abolishing tenure are in violation of the Contracts Clause and the Due Process Clause. The first sentence of Article I, § 10 of the United States Constitution provides in part:

No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility.

U.S. Const., art. I, § 10.

To establish a violation of the Contracts Clause, plaintiffs must first show that the challenged statute substantially impaired a contractual relationship. Defendants argue that the faculty's tenure was not contractual but legislatively created and could at any time be abrogated under the State's broad police power over its own public officers. Plaintiffs counter that they had contractual rights to tenure which could not be abolished at the will of the legislature.

Under *United States Trust Co. v. New Jersey,* 431 U.S. 1, 17, n. 14, 97 S.Ct. 1505, 1515, n. 14, 52 L.Ed.2d 92 (1977), a contractual obligation can be created by statute. In particular, "[a] property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). Courts in Maryland have held that contractual obligations may be formed in the employment context even when such obligations are not embodied in a written contract. For example, under *Dahl v. Brunswick Corp.,* 277 Md. 471, 476, 356 A.2d 221 (1976), contractual obligations can arise out of the employer's policy directives where the employee was aware of such policies.

In this case, the faculty's tenure rights were derived partly from the CCB By-laws and partly on a "Memorandum of Understanding" between the College and the teachers' union. In 1971, the By-laws of the Board of Trustees of the Community College of Baltimore, as approved by the City Solicitor's Office, provided:

§ 202.02 President and Faculty

(1) Faculty members shall attain permanent tenure at the College in accordance with the following regulations:

(a) The initial appointment, which shall be by written contract, shall be of a probationary nature ...

(c) Election to Tenure. The President may recommend to the Board the election to tenure of an educational staff member if he has satisfactorily completed not less than three years of probationary service. Election to tenure by the Board of Trustees of the College shall entitle the educational staff member to all the rights and privileges as provided by these By-laws, but shall not change a staff member's placement on the salary schedule.

1971 By-laws of the Board of Trustees of the Community College of Baltimore, § 202.02 (Defendants' Ex. 7). The By-laws also provided that the President shall recommend to the Board of Trustees "the suspension and/or dismissal of any faculty member who has attained tenure or whose term of appointment has not expired, for gross insubordination, incompetence and/or moral turpitude." *Id.* at § 202.03(3). Dismissal for other than moral turpitude required prior notice of one year. The faculty member was entitled to written notice of the grounds for dismissal. A tenured faculty member was entitled to a "trial" with "all requirements of *due process.*" *Id.* at § 202.02(3)(b).

In the 1970's the faculty became unionized and the 1987 By-laws of the Board of Trustees, which were in effect when CCB became NCCB, provided:

1.6.2 Tenure

The CCB tenure policies are those contained in the controlling current Memorandum of Understanding between the Board of Trustees and the Community College of Baltimore Faculty Federa-

tion, Local 1980, AFT, AFL–CIO (the Union).

1987 By-laws of the Board of Trustees of the Community College of Baltimore, § 1.6.2 (Defendants' Ex. 8). The Memorandum of Understanding effective July 1, 1988 to June 30, 1990 contains much of the same language on tenure as the 1971 By-laws. The Memorandum provides that "[f]aculty members will attain permanent tenure in the Unit in accordance with the following regulations." Memorandum of Understanding, the City of Baltimore, Community College of Baltimore Faculty Federation, Local 198–0 AFT, AFL–CIO, July 1, 1988–June 30, 1990, Article VII(I) (Defendants' Ex. 10). Those faculty hired prior to July 1, 1988 would be initially appointed by written contract and serve a five year term of probation. After this time, the President may recommend the faculty member's election to tenure. "Election to tenure by the Board of Trustees ... will be as provided in the By-laws, but such election will not change a faculty member's placement on the salary schedule." *Id.* Faculty hired after July 1, 1988 would be eligible for tenure after six years of probationary employment.

Unlike the 1971 By-laws, the Memorandum does not detail the standards for discipline of tenured faculty. The Memorandum provides only that "[n]o faculty member will be disciplined except for just cause." *Id.* at Article VIII(Q). The faculty member is entitled to written notice and may appeal any discipline through the union. Faculty with tenure at CCB were considered to have permanent tenure. Although the Memorandum of Understanding does not directly address this issue, according to the former Director of Personnel at CCB and the President of the NCCB, once granted tenure, a faculty member at CCB could not be removed except for gross insubordination, incompetence and/or moral turpitude. (Plaintiff's Ex. A, pp. 19–20; Plaintiff's Ex. B). The faculty member would be entitled to a full hearing before the Board of Trustees.

In summary then, under the By-laws and the Memorandum of Understanding, the Board of Trustees of CCB had the authority to grant tenure and fix the salaries of faculty. Initially, faculty were hired under written contracts. After several years of probationary employment, those teachers found to be qualified would be elected to tenure by the College's Board of Trustees. Faculty members granted tenure would be notified through a letter from the President. Each faculty was individually evaluated and elected to tenure. The totality of circumstances in this case suggests that the rights to tenure were of a contractual nature.

Defendants argue that any rights to tenure did not exist as of July 1, 1990, because the Memorandum of Understanding expired on that date. However, the Memorandum of Understanding was presumably not renewed because the State of Maryland was going to take over the College by that date. In any event, the Memorandum only sets forth certain employee rights and employment policies, and did not embody the entirety of the CCB employees' employment contracts. Further, defendants contend that the By-laws allowed the Board to terminate any faculty in the event of financial need. The By-laws provided:

1.6.0 Termination for Financial Exigency Termination of employment because of financial exigency should be demonstrably bona fide and is the ultimate determination of the President/subject to review by the Board of Trustees.

1987 By-laws of the Board of Trustees of the Community College of Baltimore, § 1.6.0 (Defendants' Ex. 8). The defendants argue that the termination letters sent out by CCB were under the authority of By-law 1.6.0. In essence, the defendants' position is that CCB ceased to exist after June 30, 1990, and the faculty members were terminated by the City on that date. Thus, defendants argue, when the State took over on July 1, 1990, the faculty members lost any rights to tenure they may have had at CCB.

Defendants rely on a decision in the Eighth Circuit, *Leftwich v. Harris–Stowe State College Bd. of Regents*, 540 F.Supp. 37 (E.D.Mo.1982), *aff'd in part and rev'd*

*in part,* 702 F.2d 686 (8th Cir.1983), which held that a former professor's interest in continued employment did not transfer to the new state college following transfer of control and management of the college from the St. Louis Board of Education to the state college system. The district court in *Leftwich* ruled:

> In this situation, the Board of regents is not the employer under which the plaintiff acquired this property right in continued employment. The St. Louis School Board under which the plaintiff had a property interest, transferred all control over Harris–Stowe College to the control of the Board of Regents. Even though the State of Missouri ultimately governs both of these Boards, each is a separate operating entity, empowered by the State to govern and control itself, see §§ 162.-571 R.S.Mo.1978, including employing staff for schools under their government and control. Even though little change may have occurred as a result of the transfer of control between the St. Louis Board and the Board of Regents, the fact remains that the control and government did change. The Board of Regents is not the same employer as the St. Louis Board of Education. Therefore, the property interest in continued employment does not transfer to the new state college.

*Id.* at 44. A similar situation is presented in the CCB case, where a college controlled by a locally appointed board transfers control to the State of Maryland. Plaintiffs argue that CCB was and continues to be governed by the State and that NCCB is not really a "new" college at all. Maryland courts have ruled that community colleges are created and controlled by the State and that the boards of community colleges are agencies of the State. In *Board of Trustees v. John K. Ruff, Inc.,* 278 Md. 580, 366 A.2d 360 (1976), the Maryland Court of Appeals stated:

> We note that the State Board for Community Colleges is charged with establishing general policies for the operation

of the State's community colleges and must report annually to the General Assembly on the activities of the colleges, Code (1957, 1975 Repl.Vol., 1976 Cum. Supp.) Art. 77A, § 8(d). Powers enjoyed by the boards of trustees of community colleges are bestowed by public general laws. Art 77A, § 1(a)–(m). Each community college is financed, up to certain maximum amounts, by State, local, and federal funds, but 50% of its current expenditures are received from the State. Art. 77 A, § 7.... In short, ... there is no doubt that the Board of Trustees of Howard County Community College is an agency of the State.

*Id.* at 587, 366 A.2d 360. However, while the authority of the old CCB board was ultimately derived from the State of Maryland, clearly control and government of the College has now changed. Moreover, unlike boards of other community colleges in Maryland, the CCB Board was appointed by the Mayor and City Council of Baltimore; the new Board of NCCB is appointed by the Governor of Maryland and subject to the advice and consent of the Maryland Senate. To distinguish their case from *Leftwich,* plaintiffs further point out that the faculty of Harris–Stowe College were all terminated and only those who applied to teach at the new college were considered for employment. At CCB, on the other hand, all CCB faculty were continued at NCCB unless they resigned. Thus, the faculty argue, they had a continued expectation that their permanent tenure rights would be protected.

The Court observes that this case presents a somewhat different problem from *Leftwich. Leftwich* involved a due process challenge to the loss of employment, not a Contracts Clause challenge. The court in that case never considered whether the State's action violated the Contracts Clause. In the CCB case, it could be argued that it was the State's action which abolished tenure, regardless of whether tenure rights transferred to NCCB.[5] How-

---

5. The termination of CCB employees was done under the dictates of the Maryland statute. While the statute does not specifically state that

employees of CCB will be terminated, the statute does say that former CCB employees will be offered employment at NCCB from July 1, 1990

**288**

ever, even assuming that the Court can reach the Contracts Clause issue in this case, the plaintiffs' challenge must fail.

As discussed above, the plaintiffs had a contractual right to permanent tenure at CCB. The "threshold inquiry" in a Contracts Clause claim is whether the challenged statute operates as a "substantial" impairment of a contractual relationship. *Energy Reserves Group, Inc. v. Kansas Power and Light Co.*, 459 U.S. 400, 413, 103 S.Ct. 697, 705–06, 74 L.Ed.2d 569 (1983). The Maryland statute in this case clearly results in substantial impairment of the faculty's contract rights. The Supreme Court has held that college professors may have a protected property right in continued employment even absent tenure or a formal contract. *See Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In the instant case, faculty had permanent tenure and were removable only for good cause, understood to be incompetence, gross insubordination, and/or moral turpitude. Now under NCCB, the faculty no longer have the same type of job security. Rather, they have at most a three year contract, and some will be terminated as soon as June 30, 1991.

▮ When a State has substantially impaired private contractual obligations, the legislation must serve a legitimate public purpose. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22, 97 S.Ct. 1505, 1517–18, 52 L.Ed.2d 92 (citing *Home Building and Loan Ass'n v. Blaisdell*, 290 U.S. 398, 444–45, 54 S.Ct. 231, 242–43, 78 L.Ed. 413 (1934)). Moreover, the legislation must be "upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *Id.* (citing *Blaisdell, supra*, at 445–47, 54 S.Ct. at 242–43). However, when a State impairs a private

contract, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* at 22–23, 97 S.Ct. at 1518 (citation omitted).

▮ On the other hand, the Supreme Court has ruled that when a State modifies its own contractual obligations, the courts must more carefully scrutinize the legislation:

> The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations. As with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake.

*United States Trust Co. v. New Jersey, supra*, at 25–26, 97 S.Ct. at 1519.

Thus, this Court must determine whether the legislation at issue impaired a private contract or the State's own contract. In this case, CCB was a Baltimore City institution, operating with substantial State funds. As discussed above, CCB operated under the laws governing community colleges in Maryland. Certainly the employment contracts between the faculty and CCB were public, not private, contracts. While the City and the State are not the same entities, the Board of the Community College of Baltimore could be considered an agency of the State, like the Board of the Howard Community College. *See Board of Trustees v. John K. Ruff, Inc., supra.*[6] Furthermore, although the employment contracts between CCB and its employees were not made directly by the State, the State's financial self-interest was at stake in deciding to abolish permanent

---

to through December 31, 1990. The Floor Report of the Economic and Environmental Affairs Committee on House Bill 381 provides:

> In the agreement between the City of Baltimore, the Board of Trustees of the current CCB, and the Board of Trustees of the New Community College of Baltimore, it will be agreed that the City will terminate the em-

ployees of the current CCB effective June 30, 1990.

Defendant's Ex. 3, p. 1.

**6.** The Court notes, however, that the Board at CCB was appointed by the Mayor and City Council of Baltimore, unlike other community colleges where the Governor of Maryland appoints members of the Board.

tenure. Thus, this case does not present the typical situation where state legislation modifies a contract between two private parties. Therefore, the Court will analyze the Contracts Clause claim under the higher standard of "reasonableness and necessity" as set forth in *United States Trust.*

Even under this closer scrutiny, however, the Court cannot conclude that the Maryland General Assembly or the actions of the New Community College of Baltimore violated the Contracts Clause. The Maryland legislature had legitimate concerns about the viability of CCB. Plaintiffs argue, however, that the complete abrogation of tenure was not necessary. Given the fact that the legislature had concerns about the curriculum offered at CCB and the ability of the College to service the needs of the community, this Court cannot say that it was unreasonable for the legislature to decide to abolish tenure and reevaluate the faculty to decide which teachers to retain. The State assumed financial responsibility for a city college and wanted to create a new institution while maintaining the facilities and employees of the old college during the transition. The Court concludes that the 1990 Act was a reasonable response to an important public concern.

Plaintiffs contend that total abolishment of tenure was not "necessary." To determine whether the modification of contractual obligations was necessary, the court must "consider the nature of the modification." *Maryland State Teachers Ass'n v. Hughes,* 594 F.Supp. 1353, 1370 (D.Md. 1984) (citing *United States Trust Co., supra*). "[A] State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *United States Trust Co., supra,* at 31, 97 S.Ct. at 1522. Plaintiffs argue that abrogation of tenure has not resulted in financial benefits to the College since almost all CCB faculty will be retained after the evaluation and new faculty are being hired. Financial concerns, however, were not the only reason that the State took over CCB and created NCCB. In its "Findings and policies" the statute provides:

There is a need for an effective comprehensive urban community college in Baltimore City offering educational programs that will stimulate participation of individuals, be responsive to the needs of the community, and afford open access to individuals with a variety of educational backgrounds.

Md.Educ.Code Ann. § 16–601(b)(2) (Supp. 1989). The statute further explains that Baltimore's business community is in economic transition and the State and business community need to work together to ensure a "quality institution that is responsive to the technological and continuing education needs of businesses." *Id.* at § 16–601(b)(6). The statute also recognizes a need for improvement in the College's governance structure as well as the "quality and range of academic programs and services." *Id.* at § 16–601(b)(5). These same concerns about the quality of education at CCB are evident in the Floor Report of the Economic and Environmental Affairs Committee on House Bill 381. (Defendants' Ex. 3). Given these concerns, the Court concludes that the modifications in the faculty's employment rights were necessary to achieve the State's important public purpose of ensuring that Baltimore City has a community college that meets the needs of the students and the community at large. In reaching this conclusion, the Court observes that the State chose less drastic means of creating a new college than it might have. The State retained for at least one year all the CCB professors who wanted to stay on. The faculty are no longer tenured, but based on their performance, they are offered contracts for an additional one, two, or three years.

Moreover, it is important to note that the legislation provides that the New Community College of Baltimore will only continue to operate for three years unless legislation is passed to continue the institution. Thus, the entire NCCB is in a trial stage and the whole College, including the faculty, is in a process of evaluation. Based on the record before this Court, including the legislature's stated purposes behind the challenged legislation, this Court concludes

that the 1990 Act creating the New Community College of Baltimore is reasonable and necessary to serve an important public purpose and does not violate the Contracts Clause of the United States Constitution.

### C. *The Due Process Claim*

 As for plaintiffs' due process claims, under the reasoning of *Leftwich, supra,* plaintiffs have no due process rights because "the property interest in continued employment does not transfer to the new state college." *Leftwich, supra,* at 44. Even assuming *arguendo* that the faculty's property interest in continued employment at CCB was transferred to NCCB, it appears that the new improved hearing and appeals process would comport with any due process requirements.[7] The due process requirements for terminating a public employee who can only be terminated for cause are set forth in *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985). In *Fields v. Durham,* 909 F.2d 94 (4th Cir.1990), the Fourth Circuit applied the analysis of *Loudermill* to the case of a tenured faculty member of the Community College of Baltimore who was appointed Dean and Provost of the College in 1978 and dismissed from the College in 1986. Prior to termination, the tenured public employee is entitled to (1) oral or written notice of the charges, (2) an explanation of the employer's evidence, and (3) an opportunity to present his or her side of the story. *Id.* at 97 (quoting *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985)). In the *Fields* case, the Fourth Circuit held that "the substantial process provided to Fields more than satisfied the requirements of *Loudermill." Id.* at 97–98. Fields was notified of his deficiencies and told of his right to appeal his dismissal to the President's Cabinet. Instead, Fields sought direct review before the Board of Trustees. At the hearing before the Board, Fields was represented by counsel, produced witnesses, and had the opportunity to testify

and cross-examine witnesses. His termination was affirmed by the Board.

Like the appeals process afforded to Fields, the hearing and appeal provided to faculty members rated "poor" by NCCB meets all the requirements of due process. Faculty have been given written notice of their evaluations and their rights of appeal. The College has explained to the faculty the method by which the evaluations were performed. All faculty members may obtain copies of his or her portfolio and peer, dean, and student rating sheets. (Defendants' Ex. 15, p. 1). Any faculty member rated "poor" is given an opportunity for a hearing before the Appeals Board, at which time the faculty member has an opportunity to testify, present witnesses, and be accompanied by a representative. (Defendants' Ex. 15, p. 4). The faculty member may further appeal to the President any adverse decision of the Appeals Board. The President makes the final recommendation to the Board of Trustees, and the affected faculty member may appear at the trustees' meeting. Faculty rated "good" or "excellent" are not afforded any hearing; but since they are not subject to impending termination, a hearing is not required.

Thus, even assuming that plaintiffs had a continued protected interest in employment and could only be fired for cause, the notice and procedures afforded to the faculty clearly comport with the requirements of due process.

### III. CONCLUSION

Having carefully considered the written submissions and oral arguments of the parties, it is the judgment of this Court that the legislation creating the New Community College of Baltimore does not violate the Contracts Clause of the United States Constitution and that the new improved hearing and appeals process comports with the requirements of due process. Accordingly, the Court will by separate order deny the

---

7. The appeal procedures available to the faculty are summarized on p. 283, *supra,* and set forth in the "New Community College of Baltimore Revised Faculty Evaluation Procedures" (Defendants' Ex. 15).

motion of plaintiffs for summary judgment and grant the motion of defendants for summary judgment.