716 A.2d 1107

**UNIVERSITY OF BALTIMORE et al.**

v.

**Peri IZ.**

**No. 828, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Sept. 3, 1998.

**140**

Dawna M. Cobb, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief) Baltimore, for appellants.

Peri Iz, Columbia, for appellee.

Argued before MOYLAN and HOLLANDER, JJ., and MARVIN H. SMITH, Judge (retired), Specially Assigned.

HOLLANDER, Judge.

This appeal concerns the decision of the University of Baltimore (the "University"), appellant and cross-appellee, to deny tenure and promotion to Peri Iz ("Dr. Iz"), appellee and cross-appellant.[1] Appellee filed suit in the Circuit Court for Baltimore City against the University; its President, H. Mebane Turner ("President Turner"); its Provost, Ronald Legon; and former Dean of the Business School, Daniel Costello (collectively, the "Officers").[2] In her second amended complaint, Dr. Iz alleged that the Officers violated her constitutional rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights. With respect to the University, Dr. Iz claimed that it violated the

---

1. Dr. Iz was represented below by counsel, but is *pro se* on appeal.

2. The Officers are not parties to this appeal.

Civil Rights Act of 1964, breached its contract with Dr. Iz, and breached the implied covenant of good faith and fair dealing.

After a three week trial in July 1996, the jury found in favor of the University and the Officers on the civil rights and state and federal constitutional claims, but found in favor of Dr. Iz on the contract claims lodged against the University. The jury awarded appellee $425,000.00 in damages. After the parties' post trial motions were denied, the University timely noted its appeal. It presents four questions for our review, which we have reframed and reordered:

I. Did the trial court err in refusing to grant appellant's motion for judgment as a matter of law? [3]

II. Did the trial court err in permitting appellee to testify as an expert on damages when she had not been named as an expert witness pursuant to the court's scheduling order for disclosure of experts?

III. Was the jury's award of $425,000.00 in damages excessive and speculative?

IV. Does sovereign immunity bar a claim for breach of the implied covenant of good faith and fair dealing?

In her cross-appeal, appellee presents one question for our consideration, which we have rephrased:

Did the trial court err in refusing to award specific performance of the contract?

In addition, the University has moved to dismiss appellee's cross-appeal as untimely filed. It has also moved to strike part of Dr. Iz's reply brief on the ground that it exceeds the

---

3. This "question" actually reads:

The jury's verdict is not supported by sufficient evidence because Dr. Iz's inability to work cooperatively with her colleagues was appropriately considered in her tenure review and because there was no evidence that the University acted unreasonably when it considered Dr. Iz for tenure and promotion to the rank of Associate Professor.

 A. Considering Dr. Iz's lack of collegiality did not breach her contract with the University.

 B. The evidence in support of the claim for breach of implied covenant of good faith and fair dealing did not create a jury question.

scope of the University's response to the issue raised by Dr. Iz on her cross-appeal.

We shall answer appellant's first question in the affirmative. Therefore, we need not address appellant's remaining issues or the issue presented on the cross-appeal. Moreover, we shall deny appellant's motions. Accordingly, for the reasons that follow, we shall reverse.

## Factual Background

The parties agree on most of the facts. Dr. Iz holds a Ph.D. in Decision Sciences, and her expertise lies in the study of decision-making in a business context. In 1989, the University hired Dr. Iz as a visiting assistant professor under a one-year contract. She was appointed to the University's Merrick School of Business (the "School" or "Merrick") in the Information and Qualitative Sciences ("IQS") Department.

In 1990, Dr. Iz received a tenure track contract. The agreement provided that she would be reviewed for tenure in the 1993 academic year in accordance with the terms and conditions of the University of Maryland System's Board of Regents' policy on appointment, rank, and tenure. The University of Maryland System's policy, in turn, requires each of its institutions to develop written procedures and criteria governing the promotion and tenure process. The University of Maryland System's policy also states:

[T]he terms described in the letter of appointment, together with the policies reproduced in the designated portions of the faculty handbook, shall constitute a contractually binding agreement between the institution and the appointee.

The University of Maryland System's tenure policy also provides that the President of the University is the only official actually authorized to award tenure and promotion to a faculty member. Such authority is also provided in Md.Code (1978, 1997 Repl.Vol., 1997 Cum.Supp.), § 12–109(e)(4) of the Education Article ("Educ.").

After the University discovered a miscalculation of Dr. Iz's initial tenure review date, the contract was amended to change

the tenure review date to the 1994 academic year. Nevertheless, Merrick's policy permitted Dr. Iz to seek early tenure review without penalty. Against the advice of her tenured colleagues in the IQS Department, Dr. Iz decided to undergo tenure review in academic year 1993, one year earlier than provided in her contract.

Merrick's policy does not appear to require a vote on whether to recommend early tenure review. Nevertheless, in a memorandum to Dean Costello, Dr. Milton Jenkins, the chair of the IQS Department, stated that he "need[ed] a letter signed by the department's tenured faculty concerning [Dr. Iz's] request for a change of [tenure review] date." In September 1993, by secret ballot, the tenured IQS faculty voted five to one, with one abstention, to recommend against early review. After learning of the IQS faculty's decision, Dean Costello also recommended against early review. Consequently, Dr. Iz appealed to the provost and President Turner to obtain early review. President Turner informed Dr. Iz that she could seek early review, but he advised Dr. Iz that if she were denied tenure, she would not receive another review. Because Dr. Iz persisted in undergoing early review, Provost Legon instructed the School, in the fall of 1993, to consider her for tenure and promotion to the rank of associate professor.

At Merrick, a faculty member seeking tenure and promotion submits his or her credentials in a portfolio for review by several groups and individuals. The procedures and time frame for each step in the review process are included in the School's policies and procedures. The faculty member is evaluated by: (1) the professor's tenured colleagues who hold the desired rank or higher; (2) the department chairperson; (3) the Tenure and Promotion ("T and P") Committee, a ten member panel consisting of two members from each of Merrick's five departments; (4) the dean; (5) the provost; and (6) the president.

If the provost recommends against tenure, the faculty member may appeal the recommendation to the University-wide

Faculty Appeals Committee (the "FAC"), consisting of seven tenured faculty members. If an appeal is made to the FAC, it may interview witnesses and review documents, after which it may make one of the following recommendations to the president:

1. follow the provost's recommendation;

2. reverse the provost's recommendation;

3. send the case back to an appropriate earlier stage of the tenure and promotion process for reconsideration.

The FAC may not substitute its judgment for those involved in the tenure review process, however.

At the first stage of review, Dr. Iz's tenured colleagues in the IQS Department considered whether to recommend her for tenure and promotion. According to the written report of the IQS tenured faculty, they voted three to two against tenure, with one abstention. They also voted five to one against promotion.[4] Their written report relied heavily on the Department's recent review of Dr. Iz's accomplishments in the areas of teaching, research, and service, and noted that Dr. Iz "has been showing progress and would have a stronger case next year." Dr. Rao Vemuganti, the former IQS Department chairperson, who held the position for 17 years and had hired Dr. Iz, e-mailed his vote while he was away on sabbatical; he recommended against tenure and promotion. Dr. Vemuganti opined that, although Dr. Iz was a good teacher, had publications, and was involved in professional activities, he was concerned about "her attitude and collegiality."

While the tenured IQS faculty was reviewing Dr. Iz's portfolio, Dr. Jenkins was conducting his review. Contrary to the recommendation of the IQS faculty, Dr. Jenkins recommended the award of tenure and a promotion, stating that Dr. Iz met

---

4. Appellee contests the numbers contained in the report, and cites the deposition and trial testimony of three tenured faculty members who said they voted in favor of tenure for Dr. Iz. Dr. Iz also argues that, when considering the vote of Dr. Jenkins, the IQS Department chairperson, she received four votes in favor of tenure.

or exceeded the necessary qualifications. Dr. Jenkins's recommendation was forwarded to the T and P Committee.

The T and P Committee voted six to four in favor of tenure and five in favor and five opposed to promotion to associate professor. Half of the Committee found Dr. Iz's teaching to be "good," while the other half found it to be "satisfactory." Moreover, the T and P Committee found Dr. Iz's accomplishments in research were "very good" and that her record of service was "good." Following the T and P Committee's review, all three recommendations were forwarded to Dean Costello and to Dr. Iz.

Dean Costello recommended against tenure and promotion. Although he believed that Dr. Iz met or exceeded the qualifications for research and service, he thought she did not meet the qualifications for teaching. He also observed that Dr. Iz was reluctant to accept "peer evaluation" and that her colleagues had "strongly recommended that she not apply early for tenure and promotion." Dean Costello's recommendation was then sent to Provost Legon and Dr. Iz.

Dr. Iz provided a written response to Dean Costello's report, disputing many of his observations. She also met with Provost Legon to discuss the Dean's recommendation. Before making his recommendation, the provost met with Dr. Jenkins, the Chair of the IQS Department. Provost Legon asked Dr. Jenkins to clarify statements made in his recommendation concerning Dr. Iz's disagreements with colleagues. The provost also sought to substantiate Dean Costello's concern that Dr. Iz was reluctant to accept peer evaluation. Dr. Jenkins responded in writing that Dr. Iz was inflexible, defensive, and unwilling to take constructive advice. Further, he explained that he did not raise these concerns in his recommendation because he did not believe that Dr. Iz's behavior could be considered in the tenure review process.

After reviewing the recommendations and the information provided by Dr. Iz and Dr. Jenkins, Provost Legon recommended that Dr. Iz be denied tenure and promotion. Although the provost acknowledged Dr. Iz's strengths in re-

search and service, he commented on her difficulties with her IQS colleagues. Nevertheless, he acknowledged that he could not determine who was right or wrong, or whether this merely represented "an acceptable level of professional disagreement."

Upon receiving Provost Legon's recommendation, Dr. Iz met with President Turner. She informed President Turner that she would appeal the provost's recommendation to the FAC. In discussing her disappointment with the negative recommendations that she had received, Dr. Iz accused male colleagues of making inappropriate remarks to her. She also claimed that she had learned that colleagues had used foul language in her absence when discussing her at a faculty meeting. Although Dr. Iz told President Turner about the remarks that had been disclosed to her, she did not reveal the identities of those persons who had allegedly made them.

Dr. Iz, who is Turkish, appealed the provost's recommendation on several grounds, including discrimination on the basis of gender and national origin. Before deliberating, the FAC reviewed documents and heard from Dr. Iz, Provost Legon, Dr. Jenkins, and other witnesses. Four members then voted to reverse the provost, two voted to follow the recommendation, and one voted to reconsider the case. Those who recommended against following the provost's recommendation believed that Dr. Iz's review had been unfair because it considered her lack of collegiality, a criterion not expressly set forth in the tenure review policy. The FAC found no evidence of gender discrimination, although it did conclude that Dr. Iz had been the victim of "personality discrimination," which created an unfair review process.

President Turner received the FAC's recommendation on May 2, 1994. Before making his decision, President Turner met with several people involved in reviewing Dr. Iz for tenure and promotion. He also carefully explored the process. For example, he asked for information about student evaluations; he inquired of Dr. Iz's female colleagues in the IQS Department to determine whether they had experienced dis-

crimination, to which they replied that they had not; he asked the chairperson of the T and P Committee if the process had been fair to Dr. Iz, to which she responded that it had. President Turner also met with many members of the FAC and learned that Dr. Iz had revealed to them the identities of two male colleagues who had allegedly made inappropriate remarks to her. President Turner then spoke with both men, who denied that they had made such remarks. President Turner also conferred with Dr. Jenkins, who was present at the meeting when Dr. Iz alleged that foul language had been used in her absence during a discussion about her. Dr. Jenkins contended that the allegation was false.

After reviewing the recommendations, President Turner concluded that the review process had been fair and that the alleged inappropriate conduct either could not be corroborated or had not occurred. Therefore, based on a lack of support from the IQS Department, President Turner decided not to award tenure or promotion to Dr. Iz.

Dr. Iz was advised of the decision on May 27, 1994, and was advised that her terminal year as a faculty member would be academic year 1994–95. She continued teaching at the University through June 1995. In the fall of 1995, Dr. Iz signed a two year contract to teach at Hong Kong Baptist University as an associate professor. On January 30, 1995, while in her remaining year at the University, appellee filed her original complaint in this case.

The case came to trial in July 1996; it lasted for three weeks and included testimony from 27 witnesses. Of significance here, Dr. Iz asserted that the University had breached its contract with her by considering collegiality as a criterion in her promotion and tenure review and by holding her to a higher standard because she had sought early tenure review.

During Dr. Iz's direct examination, the court permitted her to testify, over appellant's objection, as an expert witness in the field of economics. The court rejected appellant's argument that Dr. Iz should not be permitted to testify as an expert merely because she had not been identified as an

expert witness before trial. Consequently, Dr. Iz testified about the present value of the future lost income that she sought as compensatory damages.

On July 30, 1996, the jury returned a special verdict. The verdict sheet did not distinguish between a breach of the covenant of good faith and fair dealing and breach of contract, however. Instead, it asked: "Do you find that the University of Baltimore breached Dr. Iz's employment contract?" According to the verdict sheet: (1) the jury did not find that Dr. Iz's sex was a determining factor in the University's denial of tenure or promotion; (2) the jury did not find that Dr. Iz's charge of discrimination or reports of discrimination to her supervisors was a determining factor in any retaliatory action; (3) the jury did not find that any of the Officers had violated Dr. Iz's right to equal protection under the United States Constitution or Article 24 of the Maryland Declaration of Rights; (4) the jury did find that the University had breached Dr. Iz's employment contract. As noted previously, the jury awarded Dr. Iz $425,000.00 in damages for the breach of contract.

Thereafter, both parties filed post-trial motions. Appellee filed a motion seeking specific performance of her contract, and the University and the Officers collectively filed motions seeking judgment notwithstanding the verdict, remittitur, or a new trial. Those motions were denied on September 20, 1996. Appellant filed a notice of appeal on October 18, 1996. Thereafter, appellee filed her cross-appeal, contesting the trial court's denial of her motion for specific performance.

We will include additional facts in our discussion.

## Discussion

### I.

Appellant argues that the trial court erred in denying its motion for judgment as well as its motion for judgment notwithstanding the verdict. Essentially, appellant contends the following: (1) the trial court erred in failing to rule, as a matter of law, that collegiality is a factor that may be consid-

ered in promotion and tenure review even though it is not expressly included in the contract or in the University's promotion and tenure policy; (2) there was insufficient evidence to support appellee's claim that she was held to a higher standard because she sought early tenure review; and (3) there was insufficient evidence to support a finding that appellant violated the implied covenant of good faith and fair dealing.

When we review a trial court's denial of a party's motion for judgment in a jury trial, we conduct the same analysis as the trial court. *Nationwide Mut. Fire Ins. Co. v. Tufts,* 118 Md.App. 180, 189, 702 A.2d 422 (1997), *cert. denied,* 349 Md. 104, 707 A.2d 89 (1998); *James v. General Motors Corp.,* 74 Md.App. 479, 484–85, 538 A.2d 782, *cert. denied,* 313 Md. 7, 542 A.2d 844 (1988). We consider all of the evidence, including the inferences reasonably and logically drawn therefrom, in a light most favorable to the non-moving party. *Nationwide,* 118 Md.App. at 189, 702 A.2d 422; *James,* 74 Md.App. at 484, 538 A.2d 782. If there is any evidence, no matter how slight, that is legally sufficient to generate a jury question, we may affirm the trial court's denial of the motion. *Nationwide,* 118 Md.App. at 189, 702 A.2d 422; *Washington Metro. Area Transit Auth. v. Reading,* 109 Md.App. 89, 99, 674 A.2d 44 (1996). "On the other hand, where the evidence is not such as to generate a jury question, *i.e.,* permits but one conclusion, the question is one of law and the motion must be granted." *James,* 74 Md.App. at 484, 538 A.2d 782. Likewise, when we review denial of a motion for judgment notwithstanding the verdict, we use the same standard as a motion for judgment made during trial. *Nationwide,* 118 Md.App. at 190, 702 A.2d 422; *Houston v. Safeway Stores, Inc.,* 109 Md.App. 177, 182–83, 674 A.2d 87 (1996), *rev'd on other grounds,* 346 Md. 503, 697 A.2d 851 (1997). Thus, we assume the truth of all credible evidence and all inferences of fact reasonably deducible from the evidence that supports the non-moving party's position. *Nationwide,* 118 Md.App. at 190–91, 702 A.2d 422.

In its instructions to the jury, the trial court crystalized the parties' respective arguments:

> [Dr. Iz] ... claims that her employer, the Defendant, University of Baltimore, violated her employment contract by evaluating her tenure and promotion application under criteria other than the criteria of research, teaching, and service set forth in the contract. Dr. Iz also claims that the University of Baltimore violated the implied covenant of good faith and fair dealing in her employment contract by knowingly denying her tenure and promotion. . . .

> \* \* \* \*

> ... I instruct you that a contract is an agreement between two or more parties creating rights or obligations. I instruct you that, as a matter of law, [Dr. Iz] has an employment contract with the University of Baltimore.

> A contract contains promises that parties to the contract agree to be bound by. A promise is an expression by words that the person will perform or not perform certain acts in accordance with their promise. Contracts may also require interpretation. A contract is to be interpreted so as to give effect to the parties' intention at the time the contract was made. Usually, these intentions are shown by the words and terms used or not used in the contract. Words and terms are given their ordinary meaning unless that would cause an unreasonable result. Each sentence should be interpreted in view of the other sentences. Any ambiguities in the contract should be resolved against the person who drew the contract, in this case the University.

> I instruct you as a matter of law that [Dr. Iz's] employment contract with the University of Baltimore incorporated the tenure and promotion policies of the University of Maryland system, the University of Baltimore, and the Merrick School of Business.

> Dr. Iz claims that under her contract the University of Baltimore was required to judge her tenure and promotion application solely by the three explicit criteria of research, teaching, and service set forth in the tenure and promotion

policies. [Dr. Iz] also claims that the University was required to judge her application for early tenure on the same standards as those applied to all other applications.

The Defendants claim that the concept of collegiality, as defined by the witnesses, is included in the criteria of teaching, research, and services mentioned in the policies and thus is inherently a part of the contract. The Defendants also claim that no higher standard was used to review [Dr. Iz's] tenure and promotion application than was used for all tenure and promotion candidates with similar qualifications.

You must, therefore, find for [Dr. Iz] on her breach of contract claim if you find that the tenure and promotion policies provide that criteria for tenure and promotion are research, teaching, and service only and that [Dr. Iz's] tenure and promotion application was judged on criteria other than research, teaching and services. You must also find for [Dr. Iz] on the breach of contract claim if you find that the tenure application was judged by a higher standard because it was early and that the tenure and promotion policies do not provide that the standards to be applied are higher if the tenure application is early.

If the plaintiff does not prove either that the University of Baltimore breached her employment contract by judging her application for ... tenure and promotion on a basis other than research, teaching, and service, or that the University of Baltimore breached her employment contract by judging her tenure application by a higher standard because it was early, then your verdict must be for the ... University of Baltimore, on this breach of contract claim.

I instruct you that there exists an implied covenant of good faith and fair dealing in the contract between [Dr. Iz] and her employer, the defendant University. That covenant required [Dr. Iz] and the University to act in good faith towards and deal fairly with each other in regard to their employment relationship.

In this case, [Dr. Iz] claims that the University willfully breached the covenant of good faith and fair dealing by

knowingly denying her tenure and promotion on the basis of an unfair discriminatory evaluation process. Your verdict must be for [Dr. Iz] and against the University on her claim for breach of covenant of good faith and fair dealing if you find that the University of Baltimore unreasonably denied [Dr. Iz] her promotion and tenure and did so in bad faith.

If you find that the University acted reasonably in evaluating and denying [Dr. Iz] tenure and a promotion, then your verdict must be for the University on [Dr. Iz's] claim of breach of covenant of good faith and fair dealing.

## II.

We recently discussed the term "tenure" in *Johns Hopkins University v. Ritter,* 114 Md.App. 77, 80–82, 689 A.2d 91 (1996), *cert. denied,* 346 Md. 28, 694 A.2d 950 (1997). There, Chief Judge Wilner, writing for the Court, said:

[T]enure is a serious matter for both the college and the faculty.... .

... It binds the college to a commitment of continuous employment, however poor the faculty member's teaching, research, or administrative skills may become and however much controversy or embarrassment the faculty member may later bring upon the college because of his or her academic conduct or pronouncements. Perhaps for that reason, it is generally reserved for only the higher faculty ranks and is granted only after a multi-step process designed to assure that the applicant is academically, *personally,* and *temperamentally* qualified to be placed in that protected status. It is noteworthy as well that the review process ordinarily involves persons other than those who recruited the faculty member, thereby assuring an objective and more detached examination of the candidate's qualifications.

*Id.* at 94–95, 689 A.2d 91 (citations omitted) (emphasis added).

Moreover, tenure "denotes a commitment by the school, as a direct or implied part of its faculty employment agreement, that, upon a determination that the faculty mem-

ber has satisfied the conditions established by the school, the member's employment will be continuous, subject to termination only for adequate cause." *Id.* at 80–81, 689 A.2d 91; *see also Board of Community College Trustees v. Adams*, 117 Md.App. 662, 702, 701 A.2d 1113, *cert. denied*, 347 Md. 681, 702 A.2d 290 (1997). A tenured faculty member may be terminated for reasons not personal to the faculty member, however. *See, e.g., Adams*, 117 Md.App. at 714, 701 A.2d 1113; *Krotkoff v. Goucher College*, 585 F.2d 675, 679–80 (4th Cir.1978); *see also Gardiner v. Tschechtelin*, 765 F.Supp. 279 (D.Md.1991) (holding State violated neither Contracts Clause nor Due Process Clause of the United States Constitution when it took over financially troubled City College and abrogated tenure of faculty members).

■ Tenure systems are based, to some extent, on the 1940 Statement of Principles and Interpretive Comments developed by the Association of American Colleges and the American Association of University Professors. Nevertheless, there is no uniform tenure system. Tenure may be afforded in many ways, including by law, by contract, or by academic code. *Ritter*, 114 Md.App. at 82, 689 A.2d 91; *see generally Mayberry v. Dees*, 663 F.2d 502 (4th Cir.1981) (explaining tenure, its origins, its effects on faculty members and universities, and the subjective nature of the process), *cert. denied*, 459 U.S. 830, 103 S.Ct. 69, 74 L.Ed.2d 69 (1982).

In *dicta*, the *Ritter* Court recognized that the award of tenure involves a large degree of subjectivity that is somewhat tempered by the several layers of review involved in the process. In that case, we considered whether Hopkins had breached its contract with the appellees when it discharged them, notwithstanding an alleged promise to hire them as full professors. Hopkins defended on the grounds that (1) the employment contract did not include a commitment to full professorship; and (2) in the alternative, the person negotiating the contract had no authority to make such a promise. The jury returned with a verdict in favor of the appellees and awarded damages of more than $800,000. We reversed on the ground that the employee who made the contract with the

appellees did not have authority to do so. *Ritter,* 114 Md.App. at 98, 689 A.2d 91.

As we have discovered through our own research, many cases decided by the courts of other states underscore the wide discretion inherent in the tenure process. These cases also amply demonstrate the courts' general reluctance to become ensnared in an academic institution's decision with regard to tenure.

In *Stern v. University of Oklahoma Board of Regents,* 841 P.2d 1168 (Okla.Ct.App.1992), the court reversed a grant of summary judgment in favor of a faculty member who alleged breach of contract and a constitutional claim after she was denied tenure. The handbook governing tenure criteria called for an evaluation of the candidate's performance in teaching, service or creative achievement, professional service, and university service. The tenure committee recommended against tenure because the faculty member's research was deficient. The trial court concluded that the tenure committee's independent evaluation of the faculty member's scholarship did not adhere to the prescribed evaluation procedures in the handbook and thus constituted a breach of the faculty member's contract and a violation of her due process rights. The appeals court held that the trial court erred in determining that a *qualitative* evaluation of the faculty member's scholarship violated the policies set forth in the handbook on tenure. In reversing the trial court, the appeals court observed:

> Courts must take special care to preserve a university's autonomy in making lawful tenure decisions when reviewing tenure cases. Because tenure decisions require subjective judgments regarding candidates' qualifications and because of the long-term commitment a decision of tenure necessarily entails, courts should be wary of intruding into the world of university tenure decisions, absent discrimination or other unlawful action by the university.

*Id.* at 1172 (citation omitted).

What the court said in *Lovelace v. Southeastern Massachusetts University,* 793 F.2d 419 (1st Cir.1986), is also noteworthy:

[I]n view of the substantial commitment a university makes to an individual by granting him tenure, *universities have a strong need for, and traditionally have enjoyed a wide discretion in, exercising what is largely a subjective judgment in deciding to whom to grant tenure. By specifying in writing the usual criteria for promotion—teaching, scholarship, service—a university does not thereby set objective criteria, constricting its traditional discretion or transforming a largely judgmental decisional process into an automatic right to, or property interest in, tenure.*

*Id.* at 422 (emphasis added).

Similarly, the court in *Baker v. Lafayette College,* 350 Pa.Super. 68, 504 A.2d 247 (1986), *aff'd,* 516 Pa. 291, 532 A.2d 399 (1987), observed:

The evaluation of the performance of a college professor and of his or her suitability to the educational needs, goals and philosophies of a particular institution necessarily involves many subjective, nonquantifiable factors. The assessment of these factors is best performed by those closely involved in the life of the institution, not by judges. It is with good reason that the College retains discretion not to reappoint nontenured faculty members. Even if the faculty member's performance has been exemplary, measured by the most objective yardstick possible, the institution may wish to hire another person because, for example, an individual with superior qualifications has become available, or the institution decides that this particular faculty member does not mesh with the institution's educational goals and philosophies, however excellent his work and distinguished his scholarship. *As a matter of sound public policy an institution of higher learning should be free to make such decisions.* We believe that engrafting a right to judicial second-guessing of the soundness of personnel decisions made under contracts such as [appellant's] would hamper this decision-making freedom.

*Id.* 504 A.2d at 256–57 (emphasis added); *see also Beitzell v. Jeffrey,* 643 F.2d 870, 875 (1st Cir.1981) ("[T]he initial decision

to grant tenure, like various other academic matters, typically calls for the exercise of subjective judgment, confidential deliberation, and personal knowledge of both the candidate and the university community."); *Shaw v. Board of Trustees,* 549 F.2d 929, 932 (4th Cir.1976) ("[W]e will not second guess [school boards] on matters within their discretion that do not rise to the level of constitutional deprivations."); *Faro v. New York Univ.,* 502 F.2d 1229, 1231–32 (2d Cir.1974) ("Of all fields, which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision."); *Erickson v. New York Law Sch.,* 585 F.Supp. 209, 212 (S.D.N.Y.1984) (same); *Cherry v. Burnett,* 444 F.Supp. 324, 332 (D.Md.1977) ("[I]t is not the function of a federal court to second-guess the decision of a school official on matters within his discretion which do not rise to the level of a constitutional deprivation."); *Henry v. Delaware Law Sch.,* 1998 WL 15897, No. CIV.A. 8837, slip op. at 6 (Del. Ch. Jan. 12, 1998) (noting reluctance of courts to become engaged in second-guessing an academic institution's decision to deny tenure).

In the case *sub judice,* the University of Baltimore follows the University of Maryland System's Board of Regents' policy on appointment, rank, and tenure. The trial judge determined, as a matter of law, that the tenure policies of the University of Maryland System, the University of Baltimore, and Merrick were incorporated into Dr. Iz's employment contract. That determination has not been challenged on appeal by either party. Accordingly, we shall briefly set forth the relevant portions of each of those tenure policies.

The tenure and promotion policy of the University of Maryland System states, in pertinent part:

1. The criteria for tenure and promotion in the University of Maryland System are: (1) teaching effectiveness, including student advising; (2) research, scholarship, and, in appropriate areas, creative activities; and (3) relevant service to the community, profession, and institution. The relative weight of these criteria will be determined by the mission of the institution.

2. Every institution shall have written procedures governing the promotion and tenure process. Following review for form and legal sufficiency by the Office of the Attorney General, these procedures must be submitted to the Chancellor for review and approval. These procedures shall include, at a minimum, the following:

*Criteria:* A statement of criteria upon which reviews will be based, and guidelines for appointment or promotion to each academic rank, with recognition that institutional mission is the primary factor that defines these criteria.

*Procedures:* A description of tenure and/or promotion review procedures, including participants, documentation, degree of confidentiality, schedule of the annual cycle for reviews, and authority for final approval.

*Appeals:* A statement of the right of faculty to appeal promotion and tenure decisions, the grounds for such appeals, and a description of appeal procedures.

The University of Baltimore has three distinct promotion and tenure policies, one each for Merrick, the college of liberal arts, and the school of law. Each of these tenure and promotion policies is attached to the University of Baltimore's Promotion and Tenure Policies and Procedures (the "University's policy"). Although each school has its own tenure and promotion policy, the University's policy provides for a single appeals procedure that is applicable to each of its schools. It states, in pertinent part:

When a faculty member is under review for tenure or promotion, the provost shall consider all prior recommendations, including the dean's recommendation and all reports and recommendations on which the dean's recommendation has been based. After arriving at his/her own recommendation, the provost shall forward this recommendation to the president, together with all materials on which it was based, and shall provide the candidate with a copy of the recommendation.

If the provost's recommendation is negative, the candidate shall have ten calendar days within which to appeal that recommendation by requesting the president to convene the University Faculty Appeals Committee....

\* \* \* \*

Grounds for appeal shall be:

1. any error or default in procedure, when such error or default has had a prejudicial effect on the fair consideration of the candidate's case for tenure or promotion;

2. any failure to give adequate consideration either to the candidate's qualifications or to the relevant criteria for tenure, when such failure has had a prejudicial effect on the fair consideration of the candidate's case for tenure or promotion;

3. a recommendation that is arbitrary, capricious, or not supported by factual data;

4. a recommendation significantly based on any consideration which violates academic freedom or which involves discrimination on the basis of race, gender, religion, national origin, age, physical handicap, marital status, or sexual or affectional preference;

5. a recommendation which violates an explicit written understanding concerning the criteria for tenure or promotion applicable to the candidate.

In no case shall the University Faculty Appeals Committee substitute its judgment on the merits for the judgment of any divisional promotion and tenure committee.

Merrick's Policies and Procedures for Promotion and Tenure provide, in pertinent part:

Preamble: ... The ideal faculty member is terminally qualified in his/her area of teaching, is an effective teacher at both the graduate and the undergraduate levels, is engaged in scholarly activities of research and publication appropriate to the maintenance and enhancement of scholastic qualifications in his/her field, has professional ties to

current business practice, and finally, discharges his/her obligations as a faculty member through responsible service on university committees or other such assignments.

\* \* \* \*

IV. Criteria and Procedures for Tenure

\* \* \* \*

A. Criteria: While a recommendation for tenure signifies favorable recognition of a faculty member's past accomplishments, it should be more importantly an expression of confidence in a candidate's future contribution to his profession, his department, the School of Business, the university and the community. A forecast of future performance must be based on an evaluation of past performance in the required areas of competence as explained below. It must always be remembered that the granting of tenure is the most important decision made about a faculty member, since it is upon the tenured faculty that the future of the School of Business depends.

Specific factors to be considered in the evaluation of the candidate are:

1. Educational Preparation. . . .

2. Teaching Competency. . . .

3. Professional and Scholarly Activity. . . .

4. University, Professional, and Community Service. . . .

Merrick's policy then refers back to the qualifications necessary for the ranks of Professor, Associate Professor, Assistant Professor, and Instructor. Here, as we noted, Dr. Iz sought tenure and promotion to the rank of Associate Professor. The qualifications for Associate Professor are, in pertinent part:

1. Educational Preparation—the earned doctorate in an appropriate discipline. . . .

2. Teaching

(a) seven years of full-time college teaching experience. . . .

(b) excellence in instruction, as indicated by an examination of *all relevant sources of information, including input from* students, *peers,* and administrators.

\* \* \* \*

3. Professional and Scholarly Activity—evidence of continued interest, involvement, and productivity in the area of specialization. . . .

4. University, Professional and Community Service

(a) *contributions to the university through faculty or administrative committee service,* acceptance and fulfillment of special assignments from faculty organizations or the administration, and services rendered to student organizations as advisor or participant in programs.

(b) contributions to the broader community through the participation in and/or provision of services to local, regional, and national professional organizations. . . .

(Emphasis added).

Similarly, the criteria for promotion provide:

Criteria—To be considered for promotion to any rank, the candidate must possess *as a minimum* the qualifications listed for that rank. . . . It should be noted that *possession of the minimum qualifications for a rank does not guarantee promotion to that rank.*

(Emphasis added).

Nowhere in the above-quoted passages does it state that research, teaching, and service comprise an exclusive list of criteria by which to evaluate a candidate for tenure and promotion. In addition, as we noted earlier, the University of Maryland System's tenure policy provides: "Final authority for the appointment, promotion, and granting of tenure of faculty resides in the chief executive officer of the institution." Such authority is also provided by statute. *See* Educ. § 12-109(e)(4) (stating that the respective presidents of the Univer-

sity of Maryland System's constituent institutions "shall . . . [a]ppoint, promote, fix salaries, grant tenure, assign duties, and terminate personnel"). In this case, such authority rests with President Turner.

## III.

We have set forth at length the provisions of the relevant tenure and promotion policies as a framework to consider appellant's claim that it did not breach the contract, and its argument that "collegiality" is inherently a part of the contract and thus an appropriate consideration in the promotion and tenure review process. We have not found any Maryland cases that directly address the precise issues presented here. This may explain why the trial court concluded that the issue regarding collegiality was a question for the jury to resolve. Nevertheless, we are persuaded by our review of contract principles and cases from other jurisdictions that the University did not breach appellant's contract when it considered Dr. Iz's collegiality. In our view, collegiality was a legitimate factor for consideration in the promotion and tenure review process.

■■ We turn to examine the question of whether, in a breach of contract action, collegiality is an appropriate consideration for tenure and promotion, when, as here, it is not specifically listed as a criterion in the contract or policy provisions incorporated in the contract.[5] The interpretation of a contract is, in the first instance, a question of law. *Shapiro v. Massengill*, 105 Md.App. 743, 754, 661 A.2d 202, *cert.*

---

5. Prior to trial, appellant and the Officers moved for summary judgment. In denying the motion, the trial court (Heller, J.) acknowledged that collegiality is a valid consideration in tenure review, so long as it does not serve as a mask for discrimination. The trial court denied appellant's motion on the ground that a factual dispute existed as to whether collegiality was used in this case as a pretext for discrimination. The court did not address the precise contract issues that we consider here, however. Instead, the trial court stated: "Because the State contract claims rest in good part on the outcome of the sex discrimination issues, summary judgment will be denied on [the contract claims] as well."

*denied,* 341 Md. 28, 668 A.2d 36 (1995). If the contract is clear and unambiguous, there is no room for construction; we must presume the parties intended what they said in the express terms of the agreement. *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs.,* 109 Md.App. 217, 291, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997); *Shapiro,* 105 Md.App. at 754, 661 A.2d 202; *see also General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985); *Board of Trustees v. Sherman,* 280 Md. 373, 380, 373 A.2d 626 (1977).

On the other hand, when the contract language is ambiguous, the meaning of the contract is a question to be determined by the trier of fact. *Shapiro,* 105 Md.App. at 754–55, 661 A.2d 202. In deciding whether the contract is ambiguous, the court may not resort to extrinsic evidence if it will alter the plain meaning of the writing. *Admiral Builders Sav. & Loan Ass'n v. South River Landing, Inc.,* 66 Md.App. 124, 129, 502 A.2d 1096 (1986). Instead, the court is confined to a review of the contract language itself; it must consider what a reasonable person in the position of the parties would have thought it to mean. *See McIntyre v. Guild, Inc.,* 105 Md.App. 332, 355, 659 A.2d 398 (1995). We will not reverse the trial court's threshold determination that a contract is ambiguous unless the court's decision is clearly erroneous. *See* Md. Rule 8–131(c); *Shapiro,* 105 Md.App. at 755, 661 A.2d 202; *Admiral Builders,* 66 Md.App. at 128–29, 502 A.2d 1096.

"Collegiality" has been defined as "the capacity to relate well and constructively to the comparatively small bank of scholars on whom the ultimate fate of the university rests." *Mayberry,* 663 F.2d at 514. It is also defined as "the relationship of colleagues." *Merriam Webster's Collegiate Dictionary* 225 (10th ed.1997). When asked to define the term, President Turner testified:

> Collegiality is kind of a catch word. When you look it up in the dictionary, you'll find it's hard to find. I'm not even sure it's—I looked it up and all it talks about is college. It doesn't talk about collegiality or collegial, but I think it, it—

the only times it does it's not in regards to universities. I think it's in regards to, at least the dictionary I looked at— but it's not a big thing in my decision, but the ability to work with your department to make sure that the University's going to move ahead, that your best interests—your interests are in the best interest of the University of Baltimore, you betcha.

*See Stein v. Kent State Univ. Bd. of Trustees,* 994 F.Supp. 898, 909 (N.D.Ohio 1998) (equating collegiality with the "ability to get along with co-workers").

Turning to tenure cases that have been decided elsewhere, we are guided by *Bresnick v. Manhattanville College,* 864 F.Supp. 327 (S.D.N.Y.1994). There, a dance-and-theater instructor who was denied tenure filed an action for breach of contract and breach of the duty of good faith and fair dealing. The express categories to be considered for tenure evaluation included: "teaching, scholarly research, professional development, and service to the College, making 'excellence in teaching of first importance.'" *Id.* at 328. Tenure decisions were to be made by the president, upon recommendation of the Department, the Committee on Faculty Status, and the appropriate administrative officer. The Committee voted 4 to 1 in favor of tenure, but the majority indicated that it was "'concerned with [the instructor's] lack of interdisciplinary dance/theater productions....'" *Id.* The provost stated that the faculty member had difficulty working with colleagues, and the president "expressed concern about [the faculty member's] unwillingness to work with colleagues 'in a sufficiently collegial and collaborative manner,' raising 'doubts about his ability to offer the necessary leadership....'" *Id.* The court granted summary judgment in favor of the college, stating:

Cooperation and collegiality are essential to a department which may be called upon to work with other departments, and to train students to collaborate in the difficult task of orchestrating dance or drama programs in the outside world. Where what is mentioned is clearly within a relevant category, it would be blind in the extreme to require the category to be specified *in haec verba.*

> Courts ... are reluctant to intrude into decisions of this type, because doing so would substitute judicial evaluation of teaching effectiveness for the judgment of those charged with that function by the institution.
>
> ... [S]tress on overly detailed written criteria can act as a straitjacket preventing consideration of sometimes critical but more subjective factors. Courts accordingly decline to impose either regime on an institution, or distort language used to force an institution into a more paperwork-based mode.

*Id.* at 328 (citations omitted).

*McGill v. Regents of the University of California*, 44 Cal. App.4th 1776, 52 Cal.Rptr.2d 466 (1996), is also illuminating. There, the university's tenure criteria included "teaching, research and other creative work, professional activity, and University and public service." *Id.* 52 Cal.Rptr.2d at 472. The faculty member challenged the denial of tenure, asserting that the decision was based solely on his lack of collegiality, which was not one of the listed criteria. The trial court concluded that the denial was based on the faculty member's lack of "congeniality," and granted a writ of mandamus, requiring the chancellor of the university to set aside the denial of tenure. But the appellate court reversed, concluding that collegiality was an acceptable consideration in tenure review and that the record revealed that collegiality was but one consideration in denying tenure in that case. What the court said is particularly pertinent here: "Although not expressly listed as one of the tenure criteria, it is inescapable that collegiality is an appropriate consideration." *Id.*

Moreover, the court noted that the "American Association of University Professors' Statement on Professional Ethics contemplates as much." *Id.* That Statement provided:

> "As a colleague, the professor has obligations that derive from common membership in the community of scholars; respects and defends the free inquiry of associates; in the exchange of criticism and ideas, shows due respect for the opinions of others; acknowledges academic debts and

strives to be objective in professional judgment of colleagues; and accepts a share of faculty responsibilities for the governance of the institution."

*Id.* 52 Cal.Rptr.2d at 470 n. 3 (quoting American Association of University Professors, *Statement on Professional Ethics* (1987)); *see also Levi v. University of Texas,* 840 F.2d 277, 282 (5th Cir.1988) ("[W]e must recognize . . . that the future of the academic institution and the education received by its students turn in large part on the collective abilities and collegiality of the school's tenured faculty."); *Mayberry,* 663 F.2d at 514; *Mabey v. Reagan,* 537 F.2d 1036, 1044 (9th Cir.1976) ("An essential element of the probationary process is periodic assessment of the teacher's performance, including the person's ability and willingness to work effectively with his colleagues."); *Schalow v. Loyola Univ.,* 646 So.2d 502, 505 (La.Ct.App.1994) (holding that faculty handbook's provision that spoke of "evaluating the suitability of the faculty member as a professional colleague" was "certainly broad enough to include collegiality"); *see generally* Perry A. Zirkel, *Personality As a Criterion for Faculty Tenure: The Enemy It Is Us,* 33 Clev. St. L.Rev. 223, 226 n. 17 (1984–85) ("Personality factors [or collegiality] are, of course, part of teaching and service.").

■ We are persuaded that collegiality is a valid consideration for tenure review. Although not expressly listed among the School's tenure criteria, it is impliedly embodied within the criteria that are specified. Without question, collegiality plays an essential role in the categories of both teaching and service. With respect to teaching, collegiality is certainly an important factor pertaining to "excellence in instruction, as indicated by an examination of all relevant sources of information, including input from students, peers, and administrators." With regard to service-particularly, internal service—collegiality is fairly included within the criterion that includes "contributions to the university through faculty or administrative committee service, acceptance and fulfillment of special assignments from faculty organizations or the administration." Therefore, we conclude that the trial court erred in failing to hold, as a

matter of law, that collegiality was an appropriate consideration in the context of Dr. Iz's review for tenure and promotion.

We acknowledge, however, that collegiality may not be used as a pretext for discrimination. *See Stein,* 994 F.Supp. at 909 ("The ability to get along with co-workers, when not a subterfuge for sex discrimination, is a legitimate consideration for tenure decisions."). Indeed, "[t]enure decisions are not exempt under Title VII...." *Zahorik v. Cornell Univ.,* 729 F.2d 85, 93 (2d Cir.1984); *see also Fisher v. Vassar College,* 114 F.3d 1332 (2d Cir.1997) (en banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Powell v. Syracuse Univ.,* 580 F.2d 1150, 1153–54 (2d Cir.), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). In this case, however, Dr. Iz's claims of discrimination were rejected by the jury. Having failed to prove that the denial of tenure was based upon discrimination, we hold that Dr. Iz's contract claims must also fail. *See Mayberry,* 663 F.2d at 520 n. 43 (holding that, in denial of tenure case, appellant's pendent state claim alleging breach of contract failed, because it "amount[ed] to no more than a reassertion, in a different guise, of the First Amendment invasion claims").

## IV.

Even if collegiality were not a proper consideration for tenure, Dr. Iz's claim must fail. Neither the contract at issue nor the policy provisions incorporated therein provides that Dr. Iz will be awarded tenure or promotion so long as the recommendations are outstanding. Indeed, Merrick's policy expressly stated in its criteria for promotion that "possession of the minimum qualifications for a rank does not guarantee promotion to that rank." To be sure, Dr. Iz was entitled to a fair process, and she could not be denied promotion of tenure based on an illegal reason. Nevertheless, subject to the proper procedures, the ultimate authority to award tenure and

promotion by policy and by State law, rests with President Turner. Educ. § 12–109(e)(4).

The contract in this case, as amended by the parties, stated:

Dr. Iz's year of tenure review will be [academic year] 1994. If successful, tenure will become effective immediately. Dr. Iz will be given one (1) year credit toward her tenure review.

The contract also contained the following provision:

**General Conditions Governing Academic Freedom and Tenure.**

The FACULTY MEMBER will enjoy the rights and be subject to the provisions of the Board of Regents' Appointment, Rank, and Tenure Policy as the same may be amended from time to time. A current copy of this policy has been furnished to the FACULTY MEMBER along with the contract and has been read by him prior to his affixing his signature thereto.

■ Thus, the contract unambiguously stated that Dr. Iz would be entitled to tenure *review* in academic year 1994, subject to the provisions of the Board of Regents' Appointment, Rank, and Tenure Policy. Clearly, the contract did not guarantee an *award* of tenure. Rather, it provided that, "[i ]f *successful,*" Dr. Iz would be awarded tenure. Dr. Iz received the review to which she was contractually entitled.

■ As we indicated, a faculty member who has satisfactory qualifications in every category is not necessarily assured the award of tenure. *See Kumar v. Board of Trustees,* 774 F.2d 1, 11 (1st Cir.1985) ("[I]n the selection of a professor, judge, lawyer, doctor, or Indian chief, while there may be appropriate minimum standards, the selector has a right to seek distinction beyond the minimum indispensable qualities."), *cert. denied,* 475 U.S. 1097, 106 S.Ct. 1496, 89 L.Ed.2d 896 (1986). The case law that we reviewed earlier makes it abundantly clear that colleges and universities typically enjoy wide discretion because of the varied considerations that affect

the tenure decision, regardless of the merit of the individual candidate.

▮▮▮ Here, President Turner had the ultimate authority to award or deny tenure to Dr. Iz. It is noteworthy, in this regard, that the appeals process, as described in the University's policy, expressly states that it applies in the event that the *provost* gives a negative recommendation, but it is silent as to the president's decision. Indeed, there is nothing to indicate that the lower levels of review are binding upon the president. To the contrary, they are merely recommendations, and are therefore advisory in nature. *See Ritter,* 114 Md.App. at 97, 689 A.2d 91 ("The prevailing rule is that, when a tenure process is established in writing and is communicated to a prospective appointee, a subordinate official may not circumvent that process and bind the college to a tenure arrangement."); *Honore v. Douglas,* 833 F.2d 565, 568 (5th Cir.1987) (holding board of regents, which held ultimate decisional authority on whether to grant tenure, did not violate faculty member's right to procedural due process when it rejected faculty committee's recommendation to award tenure); *Erickson,* 585 F.Supp. at 212 (entering judgment as a matter of law in favor of law school on faculty member's breach of contract claim because, *inter alia,* the faculty committee's role in tenure process was merely advisory); *Amoss v. University of Washington,* 40 Wash.App. 666, 700 P.2d 350 (1985) (limiting its review to the board of regents and the president, because they were vested with final authority in tenure decisions); *cf. Lemlich v. Board of Trustees,* 282 Md. 495, 501, 385 A.2d 1185 (1978) (holding that faculty member's resignation could not be accepted by college president because sole authority to accept resignations resided in board of trustees); *see also Board of Trustees v. Fineran,* 75 Md.App. 289, 305, 541 A.2d 170 (1988); *but see Haimowitz v. University of Nevada,* 579 F.2d 526, 530 (9th Cir.1978) ("The recommendation of the fellow members of a department will surely be a major, if not determinative, factor in the final employment or tenure decision.").

An academic institution is not precluded from deciding, for example, that it does not want to assume certain financial commitments because of a concern regarding declining revenues or shrinking enrollment. Such decisions at the University of Baltimore are entirely within the discretion of President Turner. Unless he exercised his discretion in bad faith, or his reason for denying tenure constituted a pretext for unlawful discrimination, Dr. Iz's breach of contract claim cannot lie.

## V.

In addition to her argument that the University improperly considered collegiality, Dr. Iz asserted that the University breached its contract because she was held to a higher standard as a result of undergoing tenure review one year early. The trial court instructed the jury that it "must ... find for [Dr. Iz] on the breach of contract claim if [it found] that the tenure application was judged by a higher standard because it was early and that the tenure and promotion policies do not provide that the standards to be applied are higher if the tenure application is early."

As evidence of her being held to a higher standard, Dr. Iz points to (1) memoranda from her IQS colleagues and Dean Costello recommending that she not undergo early tenure review; (2) Provost Legon's memorandum granting Dr. Iz's request to seek early review, but advising her that, if promotion and tenure were denied, she would receive a terminal contract; (3) Dean Costello's memorandum recommending against awarding tenure, in which he noted that Dr. Iz applied for early tenure against the strong recommendation of her tenured IQS colleagues; (4) Provost Legon's memorandum to President Turner noting that Dr. Iz and the School of Business "might have benefitted from an additional year to develop and review this case"; (5) the majority opinion of the FAC, which concluded that her application for early tenure was among the factors that "created a hostile climate" in the Department and "precluded her receiving a fair review based on the merit of her academic achievements"; (6) the opinion of FAC member Chuck Rees who concluded that, because Dr. Iz

sought early review, it appeared that she was held to a higher standard which "seems inconsistent with the published standards"; (7) the testimony of President Turner, who stated that, in order to obtain tenure early, Dr. Iz should have obtained "broad support" from the Department, the dean, and the provost; (8) President's Turner's testimony that a person seeking early tenure should be "an extraordinary and exceptional person," and that Dr. Iz was not; (9) President Turner's testimony that Dr. Iz was required to be excellent or outstanding in all three of the stated tenure criteria; and (10) President Turner's past awards of tenure to faculty members whose recommendations were not as high as those received by Dr. Iz.

Dr. Iz's claim that President Turner held her to a higher standard centered on his statements that, to merit tenure, Dr. Iz would have to be extraordinary or exceptional. President Turner explained that such a standard required Dr. Iz to meet the same standard that she would have faced had she waited another year to undergo tenure review. Holding Dr. Iz to the same standard that she would face one year later, when she was scheduled to undergo tenure review, does not constitute a breach of contract.

To support Dr. Iz's argument that she was held to a higher standard, she also relied on President Turner's past decisions to award tenure to faculty members who had not been as highly recommended for tenure as was Dr. Iz. We are unpersuaded by appellee's argument. We do not believe that, in the exercise of discretion, President Turner was obligated to award tenure to Dr. Iz merely because he had done so in regard to other candidates, even if those recommendations had been less favorable than the ones Dr. Iz received.

Ordinarily, an employer may terminate an at-will employee at any time, for almost any, or no, reason at all. *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md.App. 470, 490, 665 A.2d 297 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (1996); *Lee v. Denro, Inc.*, 91 Md.App. 822, 829, 605 A.2d 1017 (1992); *Beery v. Maryland Med. Lab., Inc.*, 89 Md.App. 81, 94,

597 A.2d 516 (1991), *cert. denied,* 325 Md. 329, 600 A.2d 850 (1992); *Haselrig v. Public Storage, Inc.,* 86 Md.App. 116, 122, 585 A.2d 294 (1991). There is an exception, however, when the at-will employment relationship is modified by the provisions of an employee handbook or the provisions of a personnel policy. *Bagwell,* 106 Md.App. at 490, 665 A.2d 297; *Staggs v. Blue Cross of Maryland, Inc.,* 61 Md.App. 381, 392, 486 A.2d 798, *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985). It is undisputed that Dr. Iz was not an at-will employee. Instead, she was entitled to tenure review, in accordance with her contract and the School's promotion and tenure policies.

 As we stated in *Staggs,* policy provisions that limit the employer's discretion to terminate an indefinite employment or that set forth a required procedure for termination of such employment may, if properly expressed and communicated to the employee, become contractual undertakings by the employer that are enforceable by the employee.

61 Md.App. at 392, 486 A.2d 798; *see also Bagwell,* 106 Md.App. at 492, 665 A.2d 297. Nevertheless, not all personnel policies contained in employee manuals create enforceable contractual rights. We explained in *Staggs:*

[N]ot every statement made in a personnel handbook or other publication will rise to the level of an enforceable covenant. . . . "[G]eneral statements of policy are no more than that and do not meet the contractual requirements of an offer."

*Staggs,* 61 Md.App. at 392, 486 A.2d 798 (quoting *Pine River State Bank v. Mettille,* 333 N.W.2d 622, 626 (Minn.1983)); *see also Bagwell,* 106 Md.App. at 493, 665 A.2d 297. Although both *Staggs* and *Bagwell* concerned termination of employees, we consider their principles equally applicable to cases involving a decision not to promote an employee.

 *MacGill v. Blue Cross of Maryland, Inc.,* 77 Md.App. 613, 551 A.2d 501, *cert. denied,* 315 Md. 692, 556 A.2d 673 (1989), is also instructive. It inexorably leads us to conclude that Dr. Iz's allegation that she was held to a higher standard

than other candidates did not state a cause of action for breach of contract.

In *MacGill,* an employee who was denied promotion over other candidates filed a complaint for breach of contract, alleging that the employer violated its personnel policies. The employee asserted, *inter alia,* that he was discriminated against on the basis of age or sex; that the employer did not screen the applicants for minimum job qualifications; that the employer did not treat him equally with the successful candidate based on merit, qualifications, ability, and experience; and that the employer's decision to hire other candidates was not properly supported. *Id.* at 616, 551 A.2d 501. We observed that the "critical element" of the appellant's complaint was his allegation, "based upon his perception, that he was the most qualified applicant for each of the vacant positions and yet was not hired to fill them." *Id.* at 619, 551 A.2d 501. In affirming the trial court's grant of summary judgment in favor of the employer, we concluded that the employer's policies were merely "general statements of policy," which did not rise to the level of "contractual requirements for an offer." *Id.* at 620, 551 A.2d 501 (internal quotations omitted). Thus, we determined that appellant's allegation was insufficient to generate a genuine dispute of material fact for resolution by a jury. We stated:

Were such allegations accepted as sufficient, the courts would necessarily become involved in the assessment of the propriety and soundness of a company's personnel decisions; the courts would be required to act as super personnel officers, overseeing and second-guessing the company's decisions whenever an unsuccessful applicant perceives him— or herself to have been the most qualified applicant.

*Id.* at 620 n. 3, 551 A.2d 501.

We also said:

Personnel policies that specifically prescribe and limit the procedures that an employer must use in filling vacant positions, but do not prescribe with whom they are to be filled, do not rise to the level of contractual undertakings.

And they are not elevated to that status by allegations that one of the applicants is more qualified than the other applicants.

*Id.* at 620, 551 A.2d 501.

To be sure, the decision whether to award tenure or promotion did not involve a vacant position. But the tenure and promotion policies in this case "do not prescribe with whom [vacant positions] are to be filled." Unlike the case in *Mac-Gill,* in which others were selected over the appellant to fill vacancies, there was no "vacancy" at issue in the case *sub judice.* President Turner was not choosing among several candidates for one position. Instead, he was deciding whether to promote Dr. Iz alone. Thus, if the appellant in *MacGill* could not state a cause of action on the ground that he had been better qualified than others for one position, certainly Dr. Iz did not state a cause of action on the ground that she had been better qualified than others who had been promoted and awarded tenure in the past.

▪ Dr. Iz elected to seek tenure one year early. As a result, the Department, dean, provost, and president were deprived of an entire academic year in which they could observe and evaluate Dr. Iz in the academic environment. In light of the subjective nature of the tenure evaluation process, President Turner's requirement that Dr. Iz be extraordinary or exceptional to merit tenure one year early does not constitute a breach of contract. By deciding to undergo early review, Dr. Iz was, in essence, proclaiming that she was, indeed, extraordinary or exceptional compared to the typical faculty member who would normally pursue tenure review one year later.

As we have explained, the tenure process is inherently subjective and discretionary in nature. Even if a particular professor is universally well regarded at the institution, and satisfies every criterion for tenure, the professor is not necessarily entitled to tenure. We do not believe that a faculty member has stated a cause of action for breach of contract merely because, in the exercise of discretion, the president has

awarded tenure to one candidate who was not as highly regarded as another. To authorize a breach of contract action under such circumstances would, in essence, bind the President to awarding tenure based upon past recommendations.

## VI.

The jury concluded, as we noted earlier, that there was no discrimination by Dean Costello, Provost Legon, or President Turner. We must next consider whether President Turner acted in bad faith.

Appellant contends that the trial court erred in denying the motion for judgment as a matter of law because there was no evidence of breach of the covenant of good faith and fair dealing.[6] In essence, appellant argues that the covenant was not breached because the University followed its policies and procedures when it reviewed Dr. Iz for tenure.

As we observed earlier, the trial court instructed the jury regarding the covenant of good faith and fair dealing, stating:

I instruct you that there exists an implied covenant of good faith and fair dealing in the contract between [Dr. Iz] and her employer, the Defendant University. That covenant required [Dr. Iz] and the University to act in good faith towards and deal fairly with each other in regard to their employment relationship.

In this case, [Dr. Iz] claims that the University willfully breached the covenant of good faith and fair dealing by knowingly denying her tenure and promotion on the basis of an unfair discriminatory evaluation process. Your verdict must be for [Dr. Iz] and against the University on her claim for breach of covenant of good faith and fair dealing if you find that the University of Baltimore unreasonably denied [Dr. Iz] her promotion and tenure and did so in bad faith.

---

6. Appellant also contends that the implied covenant of good faith and fair dealing was not part of Dr. Iz's contract because sovereign immunity precludes the breach of contract claim. We need not decide that issue here.

If you find that the University acted reasonably in evaluating and denying [Dr. Iz] tenure and a promotion, then your verdict must be for the University on [Dr. Iz's] claim of breach of covenant of good faith and fair dealing.

Appellant argues that "[t]here is absolutely no evidence that [President] Turner acted unreasonably or in bad faith when he decided to deny tenure to Dr. Iz." Appellant also insists that, because the ultimate authority to award tenure rests with President Turner, even if others involved in the tenure review process demonstrated bad faith, it cannot be imputed to President Turner.

 "[I]f an employer has contracted to do something that requires it to exercise its discretion, then it must exercise that discretion in good faith." *Elliott v. Board of Trustees*, 104 Md.App. 93, 108, 655 A.2d 46, *cert. denied*, 339 Md. 354, 663 A.2d 72 (1995). *Elliott*, although not directly on point, is instructive. There, the college terminated a nontenured employee for leaving his shift early without his supervisor's permission. Appellant contended that he had his supervisor's permission. The employer had a grievance policy that was contained in a policy manual. Relying on *H & R Block, Inc. v. Garland*, 278 Md. 91, 99–100, 359 A.2d 130 (1976), and *MacGill*, 77 Md.App. at 619–20, 551 A.2d 501, we concluded that, "absent evidence of bad faith on the part of an employer, courts should be reluctant to overturn an employer's decision to discharge an employee when the employer has complied with its own procedures for resolving matters such as this." *Elliott*, 104 Md.App. at 108–09, 655 A.2d 46. Further, we observed:

"An employer may limit his right to terminate a worker by establishing virtually any disciplinary procedure. But courts must not read more into the procedure than is there. Unless some public policy is implicated, employee grievance mechanisms should be analyzed only for what they offer; they must not be seen automatically as quasi-judicial forums for final and impartial dispute resolution governed by standards of due process and neutral fairness."

*Id.* at 110, 655 A.2d 46 (quoting *Suburban Hosp., Inc. v. Dwiggins,* 324 Md. 294, 310, 596 A.2d 1069 (1991)). Because we found that there was no evidence or proffer of bad faith on the part of the employer, we held that there was no breach of the covenant of good faith. *Id.* at 112, 655 A.2d 46.

Close on point is *Baker,* 504 A.2d at 247. In that case, a college professor filed actions for breach of contract and defamation after he was denied reappointment. The defamation claims involved critical evaluations of the appellant's teaching ability, grading procedures, his willingness to contribute to the department, and his relationships with other faculty members. *Id.* 504 A.2d at 248. After affirming dismissal of the defamation claims, the court addressed the breach of contract count. It said: "The College's obligation to act in good faith extends only to the performance of those contractual duties it has chosen to assume." *Id.* 504 A.2d at 256. Nevertheless, the court recognized that once "the College undertook to evaluate Baker, the evaluation and review process must be honest and meaningful, not a sham formality designed to ratify an arbitrary decision already made." *Id.* 504 A.2d at 255. In rejecting the appellant's claim, the court reasoned:

> Baker had an ample opportunity to present his side of the story to all those involved in the review process, and the record is devoid of any evidence of bias, arbitrariness, misrepresentation or any other sharp practice on the part of the College.

Under the guise of "good faith," Baker would have us conduct a de novo review of the College's decision not to renew his contract. We decline Baker's invitation to reexamine the merits of the College's decision or to apply some sort of negligence standard to the myriad of "sub-decisions" involved, such as how much weight to give certain facts or how much investigation into a particular allegation was warranted, because we hold that the only reasonable construction of the contract between the parties is that at all times the College retained its sole discretion to decide whether to reappoint Baker. The Faculty Handbook states

that *"[t]o merit consideration for reappointment,* an Assistant Professor must have a record of good teaching, professional growth, and service to the College." In other words, even if Baker had received the most favorable evaluation possible, he would not be contractually *entitled* to reappointment; he would simply "merit consideration." The College still retained the freedom not to rehire him; Baker had no contractual *right* to reappointment under any circumstances. Therefore, upon finding, as we have, that the College performed all its contractual obligations fully and in good faith, the terms of the contract require that our inquiry end.

*Id.* (alteration in original) (footnote omitted); *see also Henry,* 1998 WL 15897, No. CIV.A. 8837 (Del. Ch. Jan. 12, 1998) (relying on *Baker* and granting summary judgment in favor of law school on breach of contract and libel actions brought by faculty member who had been denied tenure).

 Like the faculty handbook provision in *Baker,* both the University's policy and the Criteria and Procedures for Tenure contained in Merrick's Policies and Procedures for Promotion and Tenure, speak of a "recommendation" for tenure. Dr. Iz was entitled to tenure review according to Merrick's policies and procedures, which would ultimately lead to a recommendation to President Turner that he either award or deny tenure to Dr. Iz. Nevertheless, even if Dr. Iz had received favorable reviews at all levels of the process, Dr. Turner was not obligated to award tenure.

 It cannot be disputed that Dr. Iz took full advantage of the review and appeals procedures. There is no evidence that the process was merely a sham to ratify an arbitrary decision that President Turner had already made. Indeed, as we already noted, when President Turner received the FAC's recommendation on May 2, 1994, he met with several people involved in reviewing Dr. Iz's application for promotion and tenure: he asked for information about student evaluations; he met with Dr. Iz's female colleagues in the IQS Department to determine if they experienced discrimination; he asked the

chairperson of the T and P Committee if the process had been fair to Dr. Iz; and he met with many members of the FAC to investigate Dr. Iz's claim of inappropriate remarks being made to her. Moreover, when informed of Dr. Iz's allegations concerning inappropriate remarks, President Turner independently investigated those claims and actually confronted those who had been accused of making the statements. He concluded that they had not been made. President Turner's actions unequivocally demonstrate that he did not act in bad faith. To the contrary, the evidence established that he acted in good faith.

## Conclusion

The cases are legion that it is not the function of the courts to second-guess judgment calls made by those vested with the ultimate authority and responsibility to decide whether to award tenure. In this case, it was the president's duty to make decisions as to promotion and tenure in the best interest of the institution.

What the Pennsylvania Supreme Court stated in affirming the intermediate appellate court in *Baker* is equally apt here:

> As in all aspects of life, no procedure is fool proof. In our judicial system we have various appeals to review lower court determinations alleged to be improper or unwise. The purpose of appellate review is to correct any prior wrongdoings. Likewise, *The Faculty Handbook* sets forth review procedures. In accordance with these procedures, the Appellant appealed to the president of the College and ultimately to the board of trustees. We would be hard-pressed to conclude that the College acted in bad faith when it followed the required review procedures. This Court has no jurisdiction to review the factual determinations of a college's governing body unless it can be clearly demonstrated that that body violated its procedures.

*Baker v. Lafayette College*, 516 Pa. 291, 532 A.2d 399, 403 (1987); *see Pomona College v. Superior Court*, 45 Cal.App.4th 1716, 53 Cal.Rptr.2d 662, 668 (1996) ("[A]bsent discrimination, judicial review of tenure decisions in California is limited to

evaluating the fairness of the administrative hearing in an administrative mandamus action."); *Claggett v. Wake Forest Univ.*, 126 N.C.App. 602, 486 S.E.2d 443 (1997) (holding no breach of contract would lie for denial of tenure when the university's policies were construed to permit consideration of factors other than the expressly listed criteria and school followed its procedures); *see also Marriott v. Cole,* 115 Md. App. 493, 510, 694 A.2d 123 (considering the due process claim of a faculty member who was denied tenure and terminated and stating that she was only entitled to the procedure for consideration of tenure set forth in the policy that was included in her contract), *cert. denied,* 347 Md. 254, 700 A.2d 1215 (1997).

We conclude that there was insufficient evidence that the University breached its contract or otherwise breached the covenant of good faith and fair dealing when it denied tenure and promotion to Dr. Iz. Upon the jury's determination that Dr. Iz was not the victim of unlawful discrimination, and because there was also insufficient evidence that the University failed to follow its tenure review procedures, we hold that judgment should have been entered for appellant.

**APPELLANT'S MOTION TO DISMISS AND MOTION TO STRIKE ARE HEREBY DENIED; JUDGMENT RE-VERSED; COSTS TO BE PAID BY APPELLEE.**